UNITED STATES of America,
Plaintiff–Appellee,

v.

Maurice V. GANT, Defendant–Appellant.

No. 93–2129.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 14, 1993.

Decided Feb. 11, 1994.

**936**

Michael Jude Quinley, Office of U.S. Atty., Crim. Div., Fairview Heights, IL (argued), for U.S.

Duane P. Verity, Marion, IL (argued), for Maurice V. Gant.

Before CUMMINGS, BAUER and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Maurice Gant appeals the jury verdict convicting him of conspiracy to distribute cocaine base, attempt to possess with intent to distribute cocaine base, and use of the United States mail to facilitate the commission of a felony. *See* 18 U.S.C. § 2 (1988); 21 U.S.C. §§ 841, 843(b), 846 (1988). He submits that the government's repeated references to his post-arrest silence during cross-examination and closing argument, over defense counsel's timely objections, violated his Fifth Amendment right to due process under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). For the reasons that follow, we affirm the judgment of the district court.

## I

## BACKGROUND

On October 27, 1989, federal postal inspectors seized an Express Mail package containing two chunks of cocaine base, weighing approximately 35 grams, and 100 small bags. The package was addressed to Mr. Gant at 2018 Lamar in Mt. Vernon, Illinois. The return address, naming Oscar Jones as the sender, was determined to be fictitious.

When the package did not arrive the following week, Mr. Gant made several inquiries. James Bushong, superintendent of postal operations at Mt. Vernon, testified that Mr. Gant called him on numerous occasions, once three times a day, and identified the sender of the package as Oscar Jones. Dennis Hearne, an agent with the U.S. Postal Inspection Service, also testified that Mr. Gant called him and provided the correct mailing label information to identify the package; however, he claimed not to know the sender's address. In addition, Mr. Gant inquired into insurance coverage, indicating that the package was "relatively valuable."

After its interception by postal authorities, the package was wired, resealed, and delivered on November 6, 1989 to 2018 Lamar where Marcena Gant, Mr. Gant's sister, signed for the package. After receiving a signal that the package had been opened, police officers executed a search warrant and discovered the opened package in Mr. Gant's bedroom closet. They also confiscated a marijuana pipe and seeds, and Mr. Gant's handwritten notes recording the mailing label information including the package weight of 4.3 ounces. Both he and his wife were arrested. At that time, Mr. Gant was not questioned about his alleged drug activities, and he did not provide the police with any information. Mrs. Gant, however, stated that she suspected the package contained drugs after she opened it and saw that it had been wired. The couple was released the same day, and the charges were dropped one week later.

In October 1991, a criminal complaint, based upon the previous allegations, was filed against Mr. Gant. Four months later, however, the magistrate judge granted the government's motion to dismiss the complaint. A month later, in March 1992, a grand jury returned an indictment. Pursuant to a tentative plea agreement, Mr. Gant made a statement to Postal Inspector Rod Damery and Agent Steve Lamar of the Southern Illinois Drug Task Force. He indicated that, prior to August 1989, he had resided in California and became friends with Billy Brown, his co-defendant. After returning to Mt. Vernon, he became involved in cocaine distribution between California and Mt. Vernon. He admitted that, before his arrest, he was expecting a package through the U.S. mail containing crack cocaine from Billy Brown. Thereafter, the government withdrew its plea offer.

At trial, Mr. Gant recanted his earlier confession. He stated that he had often borrowed money from Billy Brown while living in California and subsequently in Mt. Vernon, and that he had been expecting a money order, not drugs, in the package. Several witnesses, however, testified against Mr. Gant. Billy Brown stated that he and Mr. Gant mutually agreed to sell drugs in the housing projects of Mt. Vernon and that, using the postal system or the Greyhound bus, he had sent cocaine to Mr. Gant on several occasions. Clifton Martin testified that he had purchased cocaine from Mr. Gant. Carla Bennett, a friend of the Gant family, claimed that she had seen Mr. Gant with cocaine and also had seen the substance in his sister's freezer. She stated that she had attempted to buy cocaine from him, but he had refused because she was pregnant. Marilyn Shipp, a friend of Brown's wife, stated that she had heard that Mr. Gant was dealing drugs but she never purchased any from him. Other evidence submitted by the government included copies of Western Union transfers from Mr. Gant to Kimberly Turner, Billy Brown's wife, for $480 and to Billy Brown for $190.

The jury returned a guilty verdict on all charges of the indictment.

## II

## ANALYSIS

■ Mr. Gant contends that the government violated his right to due process of law

as guaranteed by the Fifth Amendment when it continually stressed his failure to speak with the police and his refusal to identify Billy Brown as the sender of the package for more than two years after his initial arrest. Because he had the right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),[1] Mr. Gant argues that the government's references to his silence were prejudicial and undermined his right to a fair trial. After examination of the record, however, we believe that, with one exception, the government's statements were a permissible response to defense counsel's questions establishing Mr. Gant's silence, both during and after his arrest, and suggesting the reasons for his silence. After defense counsel opened the door by this line of questioning, the government properly limited its use of Mr. Gant's post-*Miranda* silence to impeach his testimony. We believe that, on the record before us, the one exception does not constitute reversible error.

A. *The Trial Record*

Our determination of the issue presented on appeal by Mr. Gant requires that we analyze in some detail the record of trial. We set forth in the following paragraphs a description of the principal parts of that record that are germane to the issue before us.

1.

At trial, defense counsel first broached the subject of Mr. Gant's silence in the following colloquy with the arresting officer during cross-examination:

Q. At any time during this arrest did Mr. Gant make any admission to you about the package?

. . . .

A. No. I didn't—I didn't ask him any questions about the package.

Q. He didn't blurt anything out?

A. Not to my recollection, no. I think he was very silent about the whole matter, as I recall.

Q. I understand the guy is standing there in his pajamas. How does he look? Does he look bewildered?

A. I think he was shocked. My opinion he was shocked. Here he's got maybe a group of policemen inside his house right now. That's probably a normal feeling to have.

Q. Not even his best pajamas?

A. I don't recall what they looked like.

Q. Did he give you any trouble?

A. No.

Q. Okay.

A. None.

Q. Was he violent with you?

A. No.

Tr. at 109–10. On redirect examination by the government, the prosecutor conducted the following redirect examination without objection from the defense counsel.

Q. In response to Mr. Verity's question on cross examination, did you indicate that Mr. Gant was silent when you confronted him in the bedroom?

A. Oh, yes. Yes, he didn't say much of anything, if anything.

Q. Didn't say anything to you at all?

A. No. No.

Q. Now, at some point in this investigation, I take it that you did speak with the persons who were present in the house?

A. Yes.

Q. Marcena Gant, Annette Gant?

1. Although Mr. Gant stated at trial that he was informed of his right to remain silent at the time of arrest, the arresting officer could not recall if he gave Mr. Gant the *Miranda* warnings. The government concedes, however, that he was informed of his rights at some point between arrest and booking. Because the government's questions and comments on Mr. Gant's silence referred to the entire period prior to his statement to the police, this case implicates issues of post-*Miranda* silence only. *See Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) (after defendant receives the *Miranda* warnings, use of his silence to impeach his exculpatory story given at trial violates due process); *Brecht v. Abrahamson*, 944 F.2d 1363, 1368 (7th Cir.1991) (*Doyle* applied where defendant was not told until his arraignment of his right to remain silent because government's questions concerning whether defendant told his story "at any time" referred *in part* to post-warning silence), *rev'd on other grounds*, ——— U.S. ———, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

A.  That's correct.

Q.  And in fact you obtained a statement from Annette Gant?

A.  That's correct.

Q.  That you participated in?

A.  Right.

Q.  But Mr. Maurice Gant told you nothing?

A.  That's correct. Nothing.

Tr. at 111–12.

When Mr. Gant testified, his attorney led him through a narrative of the events following his release in November 1989. He described his move to California and his search for a job, and he testified that, except for one request by the government for a handwriting analysis from Mrs. Gant, he did not have any contact with the police until December 1991. At that point, the government objected to the relevancy of this line of questioning. Defense counsel stated that he wanted to show the cumulative effect on Mr. Gant of the delayed investigation and to undermine the veracity of the government's witnesses. The court overruled the objection and warned defense counsel that "if you want to let it all hang out, *let it all hang out as far as why you're opening the door for that.*" Tr. at 430 (emphasis added).

Thereafter, defense counsel elicited a description of Mr. Gant's second arrest in California and asked the following:

Q.  Maurice, had you made yourself unavailable?

A.  No, sir, like I said, I've worked for the same company the last three years.

Q.  And was there any government agency that was aware of, to the best of your knowledge, aware of where you were working?

A.  To the best of my knowledge, every government agency was aware....

    . . . .

A.  I wasn't trying to hide. Like I said, it had been over two years.

Tr. at 431. The government renewed its objection and it was overruled again. Subsequently, Mr. Gant presented his exculpatory story, claiming that he was adamantly against drugs, and had been expecting a money order from Billy Brown so that he could afford to move out of his sister's home with his family.

On cross-examination, the government questioned Mr. Gant as to whom he told that he was expecting money.

Q.  Mr. Gant, you've made a number of decisions before November 6th and ever since November 6th, haven't you?

A.  Yes, sir, sure.

    . . . .

Q.  You made one real big one right away when the police grabbed you out of bed and took you down to the station and your wife in handcuffs? ... What was that decision, Mr. Gant?

A.  I don't understand what you mean.

Q.  Well, Mr. Gant, a terrible thing happened to you?

A.  Yes, sir.

Q.  And you had had nothing to do with it?

A.  That's right.

Q.  And you knew that what was supposed to be coming to you was money?

A.  Yes, sir.

Q.  Who did you tell?

A.  Mr. Quinley, like I said, what happened, one, I got arrested. When I got arrested, the first thing that happened, that officer said, "You have the right to remain silent."... No one asked me about what I expected or anything.... As far as I knew, they said, "Wait and we'll get you an attorney."... I was waiting for an attorney.

Tr. at 450–51. At that point, defense counsel raised an objection, arguing that Mr. Gant was being punished for exercising his constitutional rights. The court overruled the objection without explanation. The government then asked Mr. Gant why he did not go to the police with his exculpatory story.

Q.  Did you go back to the police and tell them Billy Brown's got the money order that he intended to send me, and something must have gone wrong, and you need to talk to Billy Brown?

A.  Mr. Quinley, they dismissed the case five days, six days later. We thought it

was over with. Like I said, I didn't hear about it again for over two years.

. . . .

Q. You said it took five or six days before it was dismissed. You called Billy Brown right away—

A. Okay.

Q. —to let him know what happened?

A. To ask him what happened.

Q. And why don't you just tell us. Why didn't you tell the police?

A. Because the police never talked to me. I only talked to an attorney.

Tr. at 458–59.

Furthermore, the government attempted to show that the delay in prosecuting Mr. Gant was due largely to his failure to inform the police of his connection with Billy Brown.

Q. As your counsel has indicated, you don't flip on anyone?

A. I don't have anyone to flip on, sir. I tell you what. If I could have gotten a deal—

Q. Excuse me, Mr. Gant, please.

A. I'm sorry.

Q. On November the 6th if it was Oscar Jones, not Billy Brown who was sent crack cocaine, could you just have said, "Talk to Billy Brown. Here's his phone number. Call him. Ask him what's going on. I don't know."

A. Yes, sir, I could. I tried to do that.

Q. But you would not flip, would you?

A. Mr. Quinley, on November the 6th when I was arrested, as I told you, the first officer told me, you have the right to remain silent. The Judge told me, "Wait until we've appointed an attorney for you, Mr. Gant."

Q. At any point in the year and a half to two years it took to identify Billy Brown as the true sender of the package, not Oscar Jones, the year and a half it took to identify him and gather the evidence on him, did you ever suggest to anyone, "I have nothing to do with this. Ask Billy Brown?"

A. Mr. Quinley, as I say, in the two years I was not being charged. The charges were dismissed six days after I was

charged here in Benton. Like I said, they said, "Go home to California, Maurice."

Q. Mr. Gant, if you weren't a partner in crime with Billy Brown, why couldn't you just give his phone number?

A. Tell who? No one asked me. That's what I'm saying. They said, "Go home and it's dismissed." I told you, the first attorney I had—you want his name?

Q. You feel right then if you hated drugs, you could do something about it right then. You got the L.A. distributor. You don't know why. You got the name in L.A. who might know something about where these drugs came from.

A. My first attorney in Mt. Vernon told me something, the reason they dismissed this, he said something must have been wrong, and I assumed that, like I said, they went to the wrong house or whatever because I didn't hear about it for over two years. They didn't keep sending me things. Mr. Damery never came and interviewed me as he was interviewing everyone else. No one mentioned this to me for two years. They showed up at my job.

Q. Well, you know, when you sit down with these people, okay, ever occur to you to suggest to them, "I thought there was going to be money in the box or in the package"?

A. I never sat down with Mr. Damery.

Q. When you sat down with him on October the 6th of this year, did it ever occur to suggest to him?

A. Yes, it sure did. Yo[u] know what my attorney said. "They don't want to hear that. You have to tell them what they want to hear if you do less than ten years of your life, Maurice."

Tr. at 492–94.

2.

The government also mentioned Mr. Gant's silence several times during closing argument. It is argued that the investigation was delayed because the government wanted to find the source of the cocaine, and that Mr. Gant knew who had sent him the package but never revealed that information:

And much has been made of how long it's been. And ladies and gentlemen, I think from the evidence that was presented, you can see clearly that law enforcement was not satisfied to stop at the person who had received the package if there was a chance that they could get the person who shipped the package. If we could cut off the source, if we can arrest and punish the source, we'll be doing a better job, and in this case they did an outstanding job of interviewing people in the community over a period of time, of not getting the truth from people in the community, but from the bits and pieces of that they were able to get, following those leads, to find Billy Brown and then to develop the evidence against Billy Brown that proved that he was the shipper of the cocaine.

As you recall when the package was sent on October the 26th, there's nothing here to connect Billy Brown to the package. And I think you recall from the evidence there was no testimony as to fingerprints or any other thing that would have identified the shipper of the package. At all times, however, Maurice Gant knew who sent him this package. And as is consistent, and this is reasonable and this is common sense and is consistent with a partner in the criminal conspiracy, Mr. Gant never ever revealed that it was Billy Brown that sent him this package.

Tr. at 537–38.

Several moments later, the prosecutor said:

You know, Maurice was desperately interested in that package, called repeatedly. We have the conversation, and in fact it's also now marked as an exhibit and admitted, with Dennis Hearne. And Mr. Gant doesn't say there was money in the package. He doesn't say how much. In fact, we at this very moment have still never been told how much money was supposed to be in the package or how much the money order was supposed to be for. The last thing we've heard it was for a motel kitchenette, but not how much.

Tr. at 540.

Finally, the government told the jury that Mr. Gant could not "be beat up for exercising his right to remain silent"; however, because defense counsel first mentioned Mr. Gant's silence, it had become a relevant consideration for the jurors. Tr. at 585.

During closing argument, defense counsel fully presented the theme that he had developed throughout the trial. He suggested that the government abused its power and pursued Mr. Gant to get another conviction. He argued also that the government's witnesses were unreliable, and he portrayed Mr. Gant as a law-abiding citizen who was against the use of drugs and who was needlessly harassed by the police from 1989 to 1991.

### B. *Governing Principles*

Once the defendant receives *Miranda* warnings, the use of his post-arrest silence to impeach his exculpatory story given at trial is "fundamentally unfair" and violates the Due Process Clause. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). Because the State is required to advise every person who is arrested of his right to remain silent, the reason for an arrestee's post-*Miranda* silence is "insolubly ambiguous." *Id.* at 617, 96 S.Ct. at 2244. Furthermore, implicit in the warnings is an assurance that silence will not carry a penalty. *Id.* at 618, 96 S.Ct. at 2245; *Greer v. Miller*, 483 U.S. 756, 762, 107 S.Ct. 3102, 3107, 97 L.Ed.2d 618 (1987). Thus, prosecutorial use of a defendant's post-*Miranda* silence justifies reversal of the conviction unless the error was harmless. *Brecht v. Abrahmson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993); *Fencl v. Abrahamson*, 841 F.2d 760, 768 (7th Cir. 1988). If, however, the defendant opens the door to government questioning by his own remarks about his post-arrest behavior or by defense counsel's questioning, *see Doyle*, 426 U.S. at 619 n. 11, 96 S.Ct. at 2245 n. 11 (discussing prosecution's permissible use of post-arrest silence "to challenge the defendant's testimony as to his behavior following arrest"), the government may use defendant's silence for the limited purpose of impeaching his testimony; it may not argue that the defendant's silence is inconsistent with his claim of innocence. *United States*

*ex rel. Savory v. Lane,* 832 F.2d 1011, 1017 (7th Cir.1987) ("[W]here impeachment by silence is permissible, the government may not argue that a defendant's silence is inconsistent with a claim of innocence."); *United States v. Shue,* 766 F.2d 1122, 1130 (7th Cir.1985) (same).

In *Shue,* upon which Mr. Gant relies heavily, the defendant on direct examination described his cooperation with the FBI's evidentiary requests after his arrest. *Id.* at 1129. On cross-examination, the defendant explained that he had refused to answer the FBI's questions because of his right to remain silent. *Id.* at 1128. The court held that the defendant created an impression of general cooperation with police, and therefore, the government could elicit testimony to rebut that impression. *Id.* at 1129; *see also United States ex rel. Saulsbury v. Greer,* 702 F.2d 651, 656 (7th Cir.) (holding that where defendant assigned a reason for his post-*Miranda* silence under direct examination before the state made any reference to it, the prosecution must be allowed to explore "the soundness of that explanation"), *cert. denied,* 461 U.S. 935, 103 S.Ct. 2104, 77 L.Ed.2d 310 (1983). Yet, because the government exceeded the boundary of permissible questioning by using the defendant's post-*Miranda* silence to emphasize the suggestion of his guilt rather than to undermine his credibility, a *Doyle* violation had occurred. *Shue,* 766 F.2d at 1131; *see also Grancorvitz v. Franklin,* 890 F.2d 34, 43 (7th Cir.1989) (stating that it is improper "to ask the jury to draw a direct inference of guilt from silence"), *cert. denied,* 495 U.S. 959, 110 S.Ct. 2566, 109 L.Ed.2d 749 (1990).

### C. *Application to This Case*

■ We turn first to the government's use of Mr. Gant's silence during the examination of the witnesses. Mr. Gant, like the defendant in *Shue,* opened the door to questions challenging his credibility by inferring on direct examination that he had cooperated with the police. Mr. Gant's theory was to portray himself as a law-abiding citizen who, although remaining silent on arrest and after the rendition of *Miranda* warnings, had always been available to the police, and who

twice had been unduly harassed by the instigation of charges and their subsequent dismissal. Once defense counsel submitted that the investigation was interminably long, and that the police were at fault, it was permissible to allow the government to rebut that inference. Indeed, defense counsel had opened the door even more widely by eliciting deliberately that Mr. Gant had been silent upon arrest. This case is quite similar to *United States v. Laughlin,* 772 F.2d 1382, 1387 (7th Cir.1985), in which the defendant admitted that he had been silent after the arrest but failed to offer any explanation as to the reason for that silence. He implied, however, that "his cooperation was prevented by his immediate arrest upon which he did not have the opportunity to state his case." *Id.* at 1389. The court therefore found no *Doyle* violation when the government broached the subject of the defendant's post-arrest silence in its cross-examination of the defendant and in its closing argument. *Id.* at 1391; *see also United States v. Mavrick,* 601 F.2d 921, 933 (7th Cir.1979) (government's references to post-*Miranda* silence permissible to rebut defendant's assertion on direct examination that he was not given an opportunity to explain his story to authorities); *United States v. Butler,* 924 F.2d 1124, 1129 (D.C.Cir.) (prosecutor could discredit defendant's statement that he never had an opportunity to explain to the police; also, to the extent that defendant waived his right to remain silent, the government could inquire into his inconsistent statements), *cert. denied,* —— U.S. ——, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991).

Our cases have recognized that the distinction between the use of silence to impeach the credibility of the defendant and the use of silence as evidence of guilt is one laden with both theoretical and practical difficulties. In *Shue,* we recognized that "a slight suggestion of guilt is 'inextricably intertwined' with any use of post-arrest silence to impeach credibility." *Shue,* 766 F.2d at 1131 (quoting *Doyle,* 426 U.S. at 635–36, 96 S.Ct. at 2253, (Stevens, J., dissenting)). However, "the slight suggestion of guilt is grudgingly permitted only because the government needs to impeach the defendant's proffered reason for remaining silent." *Id.* After

scrutinizing the record, we are confident that, during the examination of witnesses, the government's questioning did not emphasize the suggestion of guilt from Mr. Gant's silence. On cross-examination, the questions asking "Who did you tell?" and "Why didn't you go to the police?" appear designed to undermine Mr. Gant's credibility by showing that he never made much effort to cooperate with the police. The government's reference to the two-year period during which Mr. Gant never contacted the police was also an attempt to rebut the inference that Mr. Gant was the victim of government harassment. The government attempted to show that the real reason for the delayed investigation was Mr. Gant's failure to identify Billy Brown as the sender of the package.

Another of the government's questions is somewhat more problematic, but, in light of the entire record, can be characterized as permissible impeachment. The government asked Mr. Gant why he could not supply Billy Brown's phone number if he was not Brown's partner in criminal activity. However, when read in the entire context of the cross-examination, we believe that this inquiry may be fairly characterized as impeachment.

█ We turn now to the closing argument of the government. Here, as in the cross-examination, the distinction between commentary deigned to impeach and commentary designed to invite an inference of guilt is, as Judge Wood aptly put it in *Shue*, a "fine line." *Shue*, 766 F.2d at 1131. In this case, we must conclude that the focus and self-discipline that marked the government's cross-examination of witnesses was qualitatively different from its approach in addressing the jury at the end of the trial. The government's argument that Mr. Gant's silence was "consistent" with the behavior of a confederate in crime is particularly difficult to characterize as a commentary on credibility rather than as an invitation to draw an inference of guilt. Nor do we believe that the government's reminder to the jury that Mr. Gant could not be punished for exercising his constitutional right to remain silent cured this impermissible invitation.

### D. *Harmless Error*

█ Although we believe that the government crossed the "fine line" between impeachment and inference of guilt in the closing argument, we do not believe that this lapse requires reversal of the conviction. In our view, this lapse, when assessed in light of the entire record, must be characterized as harmless. In this regard, the governing principles are well established. " '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " *Arizona v. Fulminante*, 499 U.S. 279, 295, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). That is to say, the court must consider whether other evidence of guilt was not so overwhelming that, "absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." *Chapman*, 386 U.S. at 25–26, 87 S.Ct. at 828–29; *see also United States v. Hernandez*, 948 F.2d 316, 324 (7th Cir.1991) (citations omitted).

In this case, the government confiscated a package from a fictitious source addressed to Maurice Gant that contained cocaine base and 100 bags. Furthermore, Mr. Gant's indication that the contents were "valuable," and that the package weighed 4.3 ounces, both suggest strongly that he was expecting to receive an object rather than a money order. Moreover, many witnesses testified that they had bought or attempted to buy cocaine from Mr. Gant or knew that he sold drugs. Finally, after he was indicted by the grand jury, Mr. Gant admitted his role in the crime, although he attempted to recant this statement during trial.

In his defense, Mr. Gant testified at trial that he had never dealt drugs and was expecting money from Billy Brown. His wife affirmed his testimony, contradicting her earlier statement. The defense attorney attempted to discredit the testimony of the government's witnesses by emphasizing that Shipp and Brown were drug dealers and that Brown entered into a plea agreement in exchange for his testimony against Mr. Gant;

that Bennett was in a witness protection program and depended on the government for her life; and that Martin was convicted of theft and robbery and had been paid for the information he gave police.

The government presented a very strong case that Mr. Gant was guilty of the charges. Although Mr. Gant's defense theory is an appropriate factor in the harmless error analysis, "[t]he less believable the defense, ... the more likely the conclusion that the constitutional error did not contribute to the conviction." *Hanrahan v. Thieret*, 933 F.2d 1328, 1340 (7th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 446, 116 L.Ed.2d 464 (1991). Both Mr. Gant and his wife gave inconsistent statements during the investigation and trial. Although Mr. Gant claimed that his first statement was a lie and had been coached by his attorney in order to get a plea bargain, the government established on cross-examination that Mr. Gant confirmed certain allegations and denied others. Moreover, in closing argument, the government clarified that Bennett was not in a witness protection program and that Mr. Gant had merely testified that Bennett had told him she was in such a program. In addition, although the other witnesses had received benefits from the government, the jury was instructed that the testimony of each witness should be weighed with that in mind.

All of the references to Mr. Gant's silence, when viewed as part of the entire record, were actually minor factors in the government's presentation. *See Hernandez*, 948 F.2d at 324. The impermissible references in the closing argument, beyond the "fine line" between permissible and impermissible comment, were of little consequence. Therefore, the error was harmless beyond a reasonable doubt.

### Conclusion

For the foregoing reasons, the conviction of Maurice Gant is affirmed.

AFFIRMED.