STATE of Wisconsin, Plaintiff-Respondent,

v.

Brian C. WULFF, Defendant-Appellant.†

Court of Appeals

*No. 95–1732–CR. Submitted on briefs January 17, 1996.—Decided February 22, 1996.*

(Also reported in 546 N.W.2d 522.)

†Petition to review granted.

318

319

For the defendant-appellant the cause was submitted on the briefs of *James Geis* of *James Geis Law*

*Office* of Chicago and *Stephen Hurley* and *John Hyland* of *Hurley, Burish & Miliken* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Sharon Ruhly,* assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J.    Brian C. Wulff appeals from a judgment of conviction and sentence following a jury trial at which he was found guilty of attempted second-degree sexual assault, and from an order denying his postconviction motions.

Wulff challenges the conviction on four grounds. He claims that: (1) the State failed to prove each of the several "theories" of his guilt advanced at trial; (2) extraneous information relating to the burden of proof in criminal cases received by some jurors during deliberations prejudiced his defense; (3) the prosecutor's comment on his refusal to answer police questions denied him due process; and (4) the trial court committed prejudicial error in allowing hearsay testimony from the victim.

We reject each of Wulff's challenges and affirm the judgment and order.

Wulff, a student at the University of Wisconsin-La Crosse, was charged with the attempted sexual assault of another student, Carrie D. The testimony established that Wulff met Carrie D. on the street late one evening and when she told him she was too drunk to drive home, he offered to escort her on foot. According to Carrie D., she permitted Wulff to kiss her once on the way to her apartment, although he made several additional attempts to do so. She said she agreed to let him spend the night on the living-room sofa at her apart-

ment, and that after arriving there she went to her bedroom, where she fell asleep fully dressed. According to Carrie D., she awakened to find herself naked and Wulff sitting on top of her, attempting to force her to engage in oral sex. She said his efforts ceased when she screamed. She also testified that a tampon she had been wearing when she went to sleep was missing.

Wulff offered sharply contradictory testimony. He said that their walk to Carrie D.'s apartment was marked with several episodes of kissing and consensual sexual activity, and that when they arrived at the apartment she invited him into her bedroom where they engaged in some "heavy petting," during which he took her sweatshirt off and unsnapped her bra. According to Wulff, Carrie D. then passed out and, after unsuccessfully attempting to go to sleep himself, he woke her up to tell her he was leaving. He claims that he moved her to a sitting position to wake her and that when she awoke she acted surprised and alarmed and became "hysterical."

Wulff was charged with attempted sexual assault on Carrie D.'s complaint. After he was found guilty by the jury, the trial court withheld sentence and placed him on probation for a period of four years, with the first four months to be spent in the La Crosse County Jail (with work-release privileges). Other facts will be discussed in the body of the opinion.

## I. Sufficiency of the Evidence

The crime of second-degree sexual assault includes "sexual contact or sexual intercourse with a person who the defendant knows is unconscious." Section 940.225(2)(d), STATS. "Sexual contact" is defined as "any intentional touching . . . by the use of any body part or object, of the complainant's or defendant's inti-

323

mate parts" for purposes of sexual gratification or humiliation; "sexual intercourse" is defined to include "vulvar penetration," as well as "fellatio . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening . . . by the defendant." Section 940.225(5)(b) and (c).

Wulff contends that the prosecutor asked the jury to convict him on three different bases or "theories": that he attempted to have (1) sexual contact with Carrie D. while she was unconscious and both (2) oral and (3) vaginal sexual contact with her.[1] He also claims that a fourth theory was presented to the jury by the court's instructions on the statutory definition (quoted above) of "sexual intercourse" as including "any intrusion . . . into the genital . . . opening." He argues that when the State puts forth multiple alternative theories of guilt, it must prove each theory in order to convict, and that the evidence is insufficient to do so here. He concedes that the prosecution presented evidence which, if believed by the jury, was sufficient to support conviction of attempted sexual contact with an unconscious person and attempted fellatio. He argues,

---

[1] In support of his argument, Wulff points to the following statements made by the prosecutor in closing argument:

I submit that the evidence shows that the defendant took advantage of Carrie's condition. He tried to have sexual contact with her without her knowing.

\* \* \*

. . . it's not possible to mistake a penis being one inch away from your face, somebody's fingers in your mouth trying to open it and stick the penis in there.

\* \* \*

I would submit that what he did was tried to have vaginal intercourse with her.

however, that there was no evidence of any attempted vulvar penetration.

Wulff's argument is based on the supreme court's statement in *State v. Crowley*, 143 Wis. 2d 324, 334, 422 N.W.2d 847, 851 (1988), that

> where the jury may have arrived at its verdict by one of two independent grounds and there is no certainty in respect to which ground is used, a court is obliged to search the record in an effort to support the verdict of conviction and to determine that the evidence is sufficient under each mode of proof.

Citing *Crowley*, Wulff states, without elaboration, that because "no evidence exists to prove the . . . theories [of] genital intrusion and vaginal intercourse," the verdict must be set aside.

We think *Crowley* does not compel the result Wulff urges. The *Crowley* court's statement of the "rule" is expressly based on *Yates v. United States*, 354 U.S. 298 (1957), and *Stromberg v. California*, 283 U.S. 359 (1931). *Crowley*, 143 Wis. 2d at 334-35, 422 N.W.2d at 851-52. In a later case, however, the United States Supreme Court concluded that neither *Yates* nor *Stromberg* stands for such a broad proposition—that those cases "do not . . . stand for anything more than the principle that, *where a provision of the Constitution forbids conviction on a particular ground,* the constitutional guarantee is violated by a general verdict that may have rested on that ground." *Griffin v. United States*, 502 U.S. 46, 53 (1991) (emphasis added). The Court said in *Griffin* that no cases exist "in which we have set aside a general verdict because one of the possible bases of conviction was neither unconstitutional . . . nor even illegal . . . but merely unsupported by sufficient evidence." *Id.* at 56.

■

There is no question that we are generally bound by decisions of the Wisconsin Supreme Court. *State v. Carviou*, 154 Wis. 2d 641, 644-45, 454 N.W.2d 562, 564 (Ct. App. 1990). But where, as here, a Wisconsin decision is based on a United States Supreme Court case which that court later says does not stand for the proposition advanced, we are excused from that rule and may base our own decision on the most recent U.S. Supreme Court precedent. *State v. Whitaker*, 167 Wis. 2d 247, 261, 481 N.W.2d 649, 655 (Ct. App. 1992).

■

Wulff does not argue that any of the bases of his conviction—attempted sexual contact, intercourse or fellatio—is either unconstitutional or otherwise "illegal." His only challenge is to the sufficiency of the evidence to support two of them; indeed, as indicated, he concedes the sufficiency of the evidence on the other two. And because the case on which he bases his argument for reversal on sufficiency-of-the-evidence grounds lends no support to his position, we reject the argument. We agree with the Supreme Court that where the question is one of the sufficiency of the evidence, as opposed to one of constitutional or legal principle, "jurors are well equipped to analyze the evidence" and arrive at a proper result. *Griffin*, 502 U.S. at 59.[2]

---

[2] In discussing this point, the Court quoted from a Seventh Circuit case, *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991):

> "It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by

## II. The Jury's Receipt of Extraneous Information

After his conviction, Wulff moved for a new trial, asserting, among other things, that extraneous information relating to the legal definition of "reasonable doubt" had been "injected into the [jury's] deliberations by an outside influence," and that that information tainted the verdict. In support of his motion, Wulff filed the affidavit of a juror who stated that during deliberations one juror told one or more of the others that earlier in the week she had discussed the concept of "reasonable doubt" with an attorney, who said that "reasonable doubt meant that any doubts about the defendant's guilt that could be reasoned away should be disregarded."

Because any attempt to impeach a jury's verdict must necessarily be based upon the testimony or affidavits of jurors, the first step in analyzing such a challenge is to determine whether that evidence is admissible under § 906.06(2), STATS., which generally bars jurors from testifying as to anything occurring during deliberations. The statute provides only two exceptions to the rule: a juror is competent to testify as to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

Section 906.06(2), STATS., has been held to require the party seeking to impeach a verdict to first establish the admissibility of the proffered juror testimony by proving that the testimony concerns " 'extraneous

adequate evidence when there existed alternative grounds for which the evidence was sufficient."

*Griffin v. United States*, 502 U.S. 46, 59-60 (1991).

information' " (rather than the deliberative processes of the jurors), that the extraneous information was improperly brought to the jury's attention, and that it was potentially prejudicial to the party's case. *Castaneda v. Pederson*, 185 Wis. 2d 199, 209, 518 N.W.2d 246, 250 (1994) (quoted source omitted). Then, if it is determined that the juror's testimony is admissible, the court must make a factual determination whether "one or more jurors made or heard the statements or engaged in the conduct alleged." *Id.* at 211, 518 N.W.2d at 251. The challenger must prove the fact by clear, satisfactory and convincing evidence. *Id.* If the challenger does so, the final step in the analysis is a legal determination: whether, as a matter of law, the extraneous information constitutes prejudicial error requiring reversal of the verdict—that is, whether there is "a reasonable possibility that the [information] would have had a prejudicial effect upon a hypothetical average jury." *State v. Eison*, 194 Wis. 2d 160, 177, 533 N.W.2d 738, 745 (1995).

The State conceded in the trial court that the juror's affidavit was admissible under the "extraneous information" exception to the general prohibition against verdict-impeachment testimony found in § 906.06(2), STATS. On appeal, however, the State reneges on that concession, arguing that the lawyer's definition of reasonable doubt did not constitute "extraneous information" and that, as a result, the trial court should never have continued with its analysis.[3] We disagree.

---

[3] Normally, we would not consider such an argument raised for the first time on appeal. *Evjen v. Evjen*, 171 Wis. 2d 677, 688, 492 N.W.2d 361, 365 (Ct. App. 1992). The State correctly points out, however, that the supreme court, facing a similar situation in *Eison*, elected to consider the newly raised argument, inde-

The "extraneous information" contemplated in § 906.06(2), STATS.,

> is information that is not of record and is not part of the general knowledge we expect jurors to possess. It is information that a juror obtains from a non-evidentiary source. Extraneous information, in contrast with the commonly known facts and experiences we expect jurors to rely on in reaching their verdict, comes "from the outside."

*Eison*, 194 Wis. 2d at 174-75, 533 N.W.2d at 743-44 (quoted source omitted; citations omitted).

The State urges us to rule that the extraneous information exception of § 906.06(2), STATS., is limited to "factual" information relating to the case and has no application to the type of "legal" information at issue here. The argument ignores our decisions in *State v. Ott*, 111 Wis. 2d 691, 331 N.W.2d 629 (Ct. App. 1983), and *Hansen v. Crown Controls Corp.*, 181 Wis. 2d 673, 512 N.W.2d 509 (Ct. App. 1993), *vacated in part on other grounds*, 185 Wis. 2d 714, 519 N.W.2d 346 (1994), where we applied the "extraneous information" exception to dictionary definitions of legal terms introduced into the jury's deliberations from outside sources.

The State attempts to distinguish *Ott* and *Hansen* on the basis that in those cases the jurors consulted dictionaries during recesses in the trial, whereas in this case the juror obtained the attorney's opinion a day or so before the trial began.

---

pendently reviewing the record to determine whether it provided a basis for the circuit court's "implicit determination that the [material supplied to the jury] constituted extraneous, potentially prejudicial information improperly brought to the jury's attention." *State v. Eison*, 194 Wis. 2d 160, 173, 533 N.W.2d 738, 743 (1995) (citation omitted). We do the same here.

We fail to see the distinction. There is no question that the extraneous definition of reasonable doubt came from a source other than the knowledge the jurors brought with them to the jury room; it came from an attorney one of the jurors had consulted. And the fact that the consultation came on the eve of Wulff's trial, rather than during it, does not, in our opinion, sufficiently differentiate this case from the jurors' "consultations" with dictionaries in *Ott* and *Hansen*. The material brought into the deliberations by the juror in this case fits the *Eison* definition of "extraneous information" to a T: it was information "from the outside" and it was neither of record nor "part of the general knowledge we expect jurors to possess." *Eison*, 194 Wis. 2d at 174, 533 N.W.2d at 743-44 (quoted source omitted). And neither *Eison* nor any other case cited by the State requires that the information brought into the jury room must in all instances have been obtained by the juror during deliberations, or even during trial.

■

We are satisfied from our independent examination of the record that, under the circumstances of this case, the trial court could have considered the lawyer's definition to be "extraneous information" within the meaning of § 906.06(2), STATS.[4]

The next step in the analysis need not detain us long, for the State concedes that if the juror's testimony was competent, the evidence is sufficient to establish that one or more of the jurors were involved in the

---

[4] The requirement of § 906.06(2), STATS., that the extraneous information be "potentially prejudicial," *Eison*, 194 Wis. 2d at 172, 533 N.W.2d at 743, is not argued by the parties. We assume that this portion of the first step of the analysis has been met.

alleged misconduct, in that they saw or heard the extraneous information.

Finally, we consider whether there is a reasonable possibility that the information received by the jurors would have had a prejudicial effect on a hypothetical jury. On this issue it is the State's burden to " 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Eison*, 194 Wis. 2d at 178, 533 N.W.2d at 745 (quoted source omitted). As we have noted above, we review trial court determinations of prejudice independently. *Id.* We may, however, benefit from the trial court's analysis of the issue. *Id.*

After considering the juror's affidavit and hearing testimony and argument on the point, the trial court concluded that Wulff had failed to establish prejudice because, in the court's view, there was little if any difference between the definition of reasonable doubt in the jury instructions and that obtained by the juror.[5] Indeed, the court stated: "If anything, the [juror's] definition imposed a higher burden of proof on the State" than did the pattern instruction.[6]

---

[5] In so ruling, the trial court misallocated the burden of proof on the issue. It is, as we discuss below, the State's burden to establish beyond a reasonable doubt that the error complained of did not contribute to the jury's verdict. *Eison*, 194 Wis. 2d at 178, 533 N.W.2d at 745; *State v. Poh*, 116 Wis. 2d 510, 529, 343 N.W.2d 108, 118 (1984).

[6] The court's decision on the point is as follows:

This Court does not see much of a difference, if any, between the instructed definition of "reasonable doubt" and the alternative definition offered by the juror. The extraneous definition required the jurors to be able to dismiss all doubts before they could find the defendant guilty. The defendant's presumption of innocence therefore remained intact. Doubts which could not be reasoned away

Wulff disagrees. He maintains that the definition that the juror related to the others—that "reasonable doubt" means "if you can reason your doubt away, then you find them guilty [and] [i]f you can't reason your doubt away, then you can't find them guilty"—vitiates the presumption of innocence and relieves the State of its burden of proving guilt beyond a reasonable doubt. We are satisfied from our own consideration of the issue that the trial court's analysis was correct.

Using the published pattern instruction, the trial court defined "reasonable doubt" for the jury as follows:

> The term "reasonable doubt" means a doubt based upon reason and common sense. It is a doubt for which a reason can be given, arising from a fair and rational consideration of the evidence or lack of evidence. It means such a doubt as would cause a person of ordinary prudence to pause or hesitate when called upon to act in the most important affairs of life.
>
> A reasonable doubt is not a doubt which is based on mere guesswork or speculation. A doubt which arises merely from sympathy or from fear to return a verdict of guilt is not a reasonable doubt. A reasonable doubt is not a doubt such as may be used to escape the responsibility of a decision.
>
> While it is your duty to give the defendant the benefit of every reasonable doubt, you are not to search for doubt. You are to search for the truth.

under the alternative definition would be equivalent to those doubts remaining under the jury instruction (i.e., doubts for which a reason can be given). The two alternative definitions approached the reasonable doubt issue from different perspectives, but ultimately reach the same end result. If anything, the alternative definition imposed a higher burden of proof on the State.

We agree with the trial court that the "extraneous definition," like the standard instruction, required the jurors to dismiss all doubts before they could find Wulff guilty and, as a result, "[t]he . . . presumption of innocence therefore remained intact." As the trial court stated:

> Doubts which could not be reasoned away under the [extraneous] definition would be equivalent to those doubts remaining under the jury instruction (i.e., doubts for which a reason can be given). The two . . . definitions approached the reasonable doubt issue from different perspectives, but ultimately reach the same end result.

We also agree with the State that, if anything, the extraneous definition imposes a more stringent burden on the State because it does not differentiate, as does the standard instruction, between a "reasonable doubt" and one that arises merely from sympathy or from fear to return a guilty verdict—that is, an "unreasonable" doubt. As a result, the extraneous definition suggests that, to convict, it would be necessary for the jurors to reason away all doubt. We are satisfied that the jury's exposure to the extraneous definition neither detracted from nor diminished the import of the pattern instruction that a reasonable doubt is one for which a reason can be given based on a rational consideration of the evidence.

We note, too, that the court admonished the jury that it was to consider only the evidence admitted at trial and the court's instructions—instructions which had been reduced to writing and accompanied the jury to the deliberation room—in arriving at a verdict. In this case, as in all others, we presume that jurors follow

the court's instructions. *State v. Pitsch*, 124 Wis. 2d 628, 645 n.8, 369 N.W.2d 711, 720 (1985).

The jurors' exposure to the extraneous information was unfortunate, but we are satisfied that there is no reasonable possibility that the error contributed to Wulff's conviction.[7] *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985).

## III. Improper Argument

Wulff claims that his conviction should be reversed because the prosecutor improperly commented on the

---

[7] Wulff correctly points out that, in determining the possibility of prejudice from extraneous information received by the jury, we look to factors such as the nature of the information and the circumstances under which it came to the jury, the nature of the state's case and the defense, and the connection between the information and a material issue in the case. *Eison*, 194 Wis. 2d at 179, 533 N.W.2d at 745. We do not agree, however, that consideration of these factors compels reversal.

There is nothing nefarious about the manner in which the information came to the jury and nothing unusual with respect to the nature of either the State's case or the defense's case that would emphasize or magnify the effect of the information on the jury. That is not to say that the information was insignificant or immaterial. The concept of reasonable doubt is not only connected to a material issue in the case but defines the ultimate issue: the defendant's guilt. Materiality by itself, however, is not determinative. As we have discussed, the extraneous information neither contradicts nor detracts from the instructional definition of the term "reasonable doubt"; it simply states the concept in another way—a way that, if anything, suggests a higher burden on the State than that contained in the pattern instruction.

Considering these factors "in [their] totality," *Eison*, 194 Wis. 2d at 179, 533 N.W.2d at 745, we are satisfied beyond a reasonable doubt that any error was harmless.

exercise of his constitutional right to remain silent during police questioning.

Prior to beginning the legal analysis, it is important to place the challenged remarks in context. As we noted above, Wulff met an intoxicated Carrie D. on the street and accompanied her to her apartment, where the events leading up to the charges occurred. After discussing the events with friends, Carrie D. called the police, and La Crosse County Detective Kathy Larson was assigned to the case. When Wulff's roommate told him a few days later that Larson had telephoned and wanted to talk to him, Wulff returned the call and agreed to come to the police station. After advising Wulff of his *Miranda* rights, Larson asked him several questions of a general or introductory nature about his activities on the night in question. In almost all instances, he responded that he could not recall.[8] Larson, called as a witness for the defense, was asked about the interview.

> Q. Did he describe the walk to [Carrie D.'s] residence to you?
> A. I don't really believe he described the walk. He couldn't recall too much about it. He just said they walked to the residence . . . .
> Q. And at that point he didn't want there to be a misunderstanding?
> A. Yes, he advised me he didn't want there to be any misunderstanding about anything. And that was the end of our conversation.

In his trial testimony, Wulff discussed his walk to Carrie D.'s apartment in considerable detail. He said

---

[8] Wulff was unable to say, for example, what time he went to the downtown area, how long he remained there, or how he and Carrie D. met and decided to walk to her apartment.

he and Carrie D. engaged in "small talk," "jok[ing] around . . . and laughing," and that at one point, while crossing a street, they kissed. According to Wulff, after he discussed his relationship with his girl-friend—which he said he was terminating—they walked on for a few more blocks and then turned off onto a dimly lit street, where they "stopped, and . . . started to kiss some more." Wulff testified that things then got "steamy" and they "made out for an extended period of time," partially undressing and touching each other. They then continued the walk, stopping to kiss on "maybe one or two other occasions." Wulff went on to describe their ensuing conversations which resulted in his accompanying Carrie D. to her apartment.

Wulff also testified about his conversation with Detective Larson, emphasizing that, even after he stopped responding to her questions when they began to get into "more detail," he continued to cooperate fully with the police—submitting to physical tests, etc.—because he "didn't have anything to hide."[9]

In the prosecutor's closing argument to the jury, while characterizing Wulff's demeanor on the witness stand as "very, very pat, very cool," almost as if he was "describing a sporting event," she remarked:

---

[9] Earlier, in his opening statement to the jury, Wulff's attorney stressed his client's cooperation with Larson.

He's flabbergasted, can't believe that the police are interested in him, just doesn't know why. Nonetheless, he does what he's instructed, and he calls . . . Sergeant Larson. He wants some answers.

Sergeant Larson doesn't want to talk to him over the phone . . . .

. . . .

Brian, he doesn't have anything to hide. So he goes [to police headquarters]. [He] [d]oesn't stay away from the police, doesn't avoid the police. . . . He comes back to LaCrosse, he goes and talks to Sergeant Larson. . . .

I question whether or not he was being realistic. He had explanations today for conversations that he could not recall at all when he was talking to Sergeant Larson two days later.

He could not remember anything about how it came to be that they walked home together. He couldn't remember who said what. And yet today he gave you a very detailed description of how that conversation occurred.[10]

Responding, Wulff's attorney posed the issue as a question not of the "believability" of the witnesses but rather of "who is the more reliable historian . . . . A person who was passed out drunk . . .? Or someone who wasn't?" Urging the jury to contrast Carrie D.'s actions with Wulff's, he emphasized Wulff's cooperation with the police—especially his willingness to talk to Larson despite knowing he might be charged with attempted sexual assault:

You've got to . . . ask yourselves, did he act like someone who committed this crime? . . . . He gets a call . . . [that] the police want to talk to [him]. . . . When he calls them, they set up an appointment, and he makes it.

Hey, if I committed a crime, and I found out the cops wanted to talk to me . . . I wouldn't go anywhere near them . . . . I ain't going back there. . . .

There were apparently some details left out of his statement to Sergeant Larson, but don't let that throw you off.

---

[10] The prosecutor went on to discuss Wulff's "explanations" of the various events of the evening which, according to her, "make very little sense" in light of other facts. For example, she said, "He talked to Sergeant Larson about the walk home but gave no information . . . about all of this fondling and sexual activity that's happening on the way."

In the prosecutor's rebuttal, addressing defense counsel's suggestion that the State was somehow criticizing Wulff for talking to a lawyer, she said:

> I am not at all saying that a person should not have the benefit of counsel. I want everyone to have the best attorney they can . . . .
>
> But when a man can't remember anything when he's talking to a police officer about how a conversation took place, what was said, how something happened, and then when he testifies at trial months later, after having the police reports, and he has all those details, and he can talk for five or ten minutes about that conversation, I think that's worth thinking about. How did that happen?
>
> When a man does not want to say anything to the police until he finds out what the police know, I think that's worth thinking about. He had access to everything. And what do you think might have helped him furnish those details? What was in those police reports and months spent thinking about it?

The prosecutor's remarks in closing and rebuttal argument form the basis of Wulff's appeal.

In *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), the Supreme Court held that it is constitutionally impermissible "to allow [an] arrested person's silence to be used to impeach an explanation subsequently offered at trial."[11] (Footnote omitted.) The Wisconsin Supreme

---

[11] The defendants in *Doyle*, like Wulff, had been given *Miranda* warnings prior to being questioned. One said nothing at all and the other, after learning that they had been arrested in connection with a murder investigation, told the officers he "[didn't] know what [they] were talking about." *Doyle v. Ohio*, 426 U.S. 610, 615 n.5 (1976). During trial, each testified that he had been "framed," and each was asked on cross-examination why he had not told the frame-up story to the police when

Court followed *Doyle* in *State v. Brecht*, 143 Wis. 2d 297, 316, 421 N.W.2d 96, 103-04 (1988).

The State argues, however, that under a later case, *Anderson v. Charles*, 447 U.S. 404 (1980), the prosecutor's statements should be considered not as a comment on Wulff's silence but as permissible impeachment by reference to the "incompleteness of his answers" to Larson's questions. The case deserves consideration.

Glenn Charles, the defendant in *Anderson*, was arrested while driving a stolen car belonging to a murder victim. After receiving *Miranda* warnings, he was questioned by police about the stolen car. He said that when he took the car, it was sitting on a street near the intersection of Washtenaw and Hill streets in Ann Arbor, Michigan. He testified at trial, however, that he took the car from a tire-store parking lot some two miles distant from that intersection. On cross-examination, the prosecutor suggested that Charles had made up the tire-lot location, pointing out that the lot was visible from the window of the jail cell where Charles had been held prior to trial. When Charles denied that the testified-to location was a "recent fabrication," the prosecutor asked: "Well, you told [the detective] back when you were first arrested, you stole the car back on Washtenaw and Hill Street?" *Id.* at 406.

The Supreme Court concluded that, while "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances . . . [it] does not apply to cross-examination that merely

arrested. The Court held that such impeachment was fundamentally unfair in light of the *Miranda* warnings, which informed each defendant of his right to remain silent and which the court said carried the implied assurance that such silence will not be used against him. *Id.* at 618-19.

inquires into [the defendant's] prior inconsistent state-
ments." *Id.* at 408. The *Anderson* Court saw *Doyle* as
having no application to Charles's situation because
Charles "ha[d] not remained silent at all" but had "vol-
untarily sp[oken] after receiving Miranda warnings."
Thus, said the Court, the questions were no more than
"inquir[ies] into [his] prior inconsistent statements"
and were not comments on his silence (because he had
not elected to remain silent). *Id.*

> The quoted colloquy, taken as a whole, does "not
> refe[r] to [Charles's] exercise of his right to remain
> silent; rather [it asks him] why, if [his trial testi-
> mony] were true, he didn't tell the officer that he
> stole the decedent's car from the tire store parking
> lot instead of telling him that he took it from the
> street."

*Id.* at 408-09. The State maintains that *Anderson* is on
all fours with this case.

Wulff disagrees, asserting without elaboration
that in his case the question is not one of impeachment
but plainly one of an impermissible comment on his
silence. He says that "there is a distinction between
exposing the fact of a Fifth Amendment invocation to
the jury and the separate tactic of arguing to the jury
that a negative inference should be drawn against a
defendant from that fact." We do not see the prosecu-
tor's comments, considered in the context of the trial,
as asking the jury to consider the exercise of his fifth
amendment rights "as a legitimate reason to suspect
the truth of his trial testimony," as Wulff asserts.

The concept is not easily applied: The government
may use a defendant's post-arrest silence to impeach
his or her testimony in certain respects, but it may not
argue that the defendant's silence was inconsistent

with his claim of innocence. It is a fine line, but we believe two federal cases are instructive in drawing it in this case.

In *United States v. Allston*, 613 F.2d 609 (5th Cir. 1980), the defendant, Lawrence Allston, was charged with murder. He testified at trial about his conversations with an investigator, indicating that he had cooperated with police by telling the investigator where he was on the night in question and suggesting the names of witnesses who could be contacted to verify his story: "I told him I had no knowledge of this thing, and I told him where I was at the time. . . . I told him who I was with. I told him to check it out." *Id.* at 611. Allston objected to the prosecutor's subsequent questions inquiring why he "didn't volunteer" the names of several additional witnesses, and whether there was any reason he did not mention these additional witnesses to the investigator. *Id.* at 610. Allston claimed that the questions constituted improper comment on his silence.

The court of appeals rejected the argument, concluding that Allston had " 'opened the door' " to the questions by attempting to "create the impression that he had cooperated fully in the government's investigation of the crime." *Id.* at 611 (quoted source omitted). The court said,

> Thus, this case represents one of the exceptions noted in *Doyle* where the prosecution is entitled to use the defendant's post-arrest silence to impeach his testimony as to his behavior following arrest. Furthermore, in *United States v. Fairchild*, 505 F.2d 1378 (5th Cir. 1975), cited in . . . *Doyle* . . ., this court held under similar circumstances that a defendant who raised the issue of his cooperation with the authorities "opened the door" to a full

development of that subject. As we noted in *Fairchild*, "[a]ssuming the law would have excluded from evidence [the defendant's] silence had he not broached the subject of cooperation, once he did broach it the bar was lowered and he discarded the shield which the law had created to protect him."

*Allston*, 613 F.2d at 611.

The Court of Appeals for the Seventh Circuit reached a similar result in *United States v. Gant*, 17 F.3d 935 (7th Cir. 1994). Gant was arrested after he received a package of cocaine base through the mails. Among other things, he testified at trial that he had not tried to hide from authorities during the two years the crime was under investigation, implying that he had cooperated with them. *Id.* at 938-39. On appeal, he argued that the prosecutor improperly invoked his silence as evidence of his guilt by asking him on cross-examination why he did not tell the investigating officers the identity of the person who sent the package to him. The court rejected the argument, noting first that, under *Doyle* and other cases, the bar against use of post-arrest silence to impeach a defendant's exculpatory testimony at trial is inapplicable where "the defendant opens the door to government questioning by his own remarks." *Id.* at 941. The court concluded that Gant had "opened the door to questions challenging his credibility by inferring on direct examination that he had cooperated with the police . . . ." *Id.* at 942.[12]

---

[12] The *Gant* court looked to the record and determined that the government's questioning "did not emphasize the suggestion of guilt from Mr. Gant's silence." *United States v. Gant*, 17 F.3d 935, 943 (7th Cir. 1994). The court said: "On cross-examination, the questions asking 'Who did you tell?' and 'Why didn't you go to the police?' appear designed to undermine Mr. Gant's

Courts have recognized that "the distinction between the use of silence to impeach the credibility of the defendant and the use of silence as evidence of guilt is one laden with both theoretical and practical difficulties." *Gant*, 17 F.3d at 942. It also is true that at least some suggestion of guilt is " ' "inextricably intertwined" ' " with any use of post-arrest silence to impeach credibility. *Id.* (quoted sources omitted).[13]

In this case Wulff, after telling Detective Larson that he could not recall what occurred while he and Carrie D. were walking to her apartment, testified at length and in considerable detail about the route they took to her apartment, as well as their conversations and lovemaking activities along the way. Under the authorities we have discussed above, we see nothing in

credibility by showing that he never made much effort to cooperate with the police," as he had suggested in direct testimony. *Id.*

[13] The quoted phrase is from Justice Stevens's separate opinion in *Doyle*, where he said:

> In my judgment portions of the prosecutor's argument to the jury overstepped permissible bounds. In each trial, he commented upon the defendant's silence not only as inconsistent with his testimony that he had been "framed," but also as inconsistent with the defendant's innocence. Comment on the lack of credibility of the defendant is plainly proper; it is not proper, however, for the prosecutor to ask the jury to draw a direct inference of guilt from silence—to argue, in effect, that silence is inconsistent with innocence. But since the two inferences—perjury and guilt—are inextricably intertwined because they have a common source, it would be unrealistic to permit comment on the former and to find reversible error in the slightest reference to the latter. In the context of the entire argument and the entire trial, I am not persuaded that the rather sophisticated distinction between permissible comment on credibility and impermissible comment on an inference of guilt justifies a reversal of these . . . convictions.

*Doyle*, 426 U.S. at 633-36 (Stevens, J., dissenting) (footnote omitted).

the prosecutor's comments in that regard—or her asking the jury to "think about" Wulff's silence—as crossing the line. The prosecutor was not asking the jury to infer guilt from Wulff's silence and his inability to recall events when talking to Larson; she was asking them to consider that silence, and that failure to recall, as bearing on Wulff's credibility, given his detailed testimony on those events at trial. Additionally, as we have noted, Wulff may be said to have "opened the door" to such comment himself by emphasizing his cooperation with the police throughout the trial, from defense counsel's opening statement, through Wulff's own testimony, to counsel's closing argument.

After considering the challenged remarks in the context of the entire trial, we are satisfied that they were a proper impeaching response to Wulff's own testimony and arguments and did not constitute a suggestion of guilt from his silence during the interview with Detective Larson.[14]

### IV. Admission of Hearsay Testimony

Finally, Wulff argues that the trial court erroneously allowed into evidence various hearsay statements made by Carrie D. following the incident. Because he describes the statements only cursorily, and then without citation to the record, it is difficult to ascertain the precise nature of the evidence to which he objects.

██

Beyond that, he acknowledges that he did not object to the evidence in the trial court, and that the

---

[14] Bolstering our conclusion in this regard is the fact that the prosecutor's remarks were directed primarily toward non-charged, apparently consensual events occurring sometime prior to the conduct for which Wulff was charged.

failure to do so is generally considered to waive the objection, *State v. Damon*, 140 Wis. 2d 297, 300, 409 N.W.2d 444, 446 (Ct. App. 1987). As a result, he asks us to exercise our discretionary power to reverse in the interest of justice "under sec. 752.35, Stats."[15] Because he neither indicates how our discretionary powers under that statute might be applicable to his case nor argues why they should be exercised,[16] we need not proceed further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992) (arguments that are not developed themes reflecting legal reasoning, but only general statements, will not be considered on appeal); *Lechner v. Scharrer*, 145 Wis. 2d 667, 676, 429 N.W.2d 491, 495 (Ct. App. 1988) (court of appeals need not consider arguments lacking citations to authority or references to the record).

*By the Court.*—Judgment and order affirmed.

SUNDBY, J. (*dissenting*). Brian C. Wulff appeals from a judgment entered March 17, 1994, on a jury verdict convicting him of second-degree sexual assault, contrary to § 940.225(2)(d), STATS. Wulff raises a number of issues but the one I conclude requires reversal is the prosecutor's closing rebuttal argument that Wulff's

---

[15] The statute provides:

In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record.

[16] We may, in our discretion, grant a new trial in the interest of justice under § 752.35, STATS., only if "we are satisfied that a second trial will produce a different result or the controversy has not been fully tried." *Klink v. Cappelli*, 179 Wis. 2d 624, 635, 508 N.W.2d 435, 439 (Ct. App. 1993).

post-*Miranda*[1] silence during police questioning was a factor "worth thinking about" in assessing Wulff's credibility.

The State argues that Wulff invited the error by testifying in his defense and describing the events leading up to the alleged assault. However, this is not a case in which a defendant has given one story to police and then testifies differently. In this case, Wulff simply told the investigating officer that he didn't feel comfortable answering any more questions. The prosecutor asked him whether the reason he had stopped talking to the police was because "you wanted her [Sgt. Larson] to tell you what she knew before you would talk to her, correct?" The defendant answered, "Yes."

The prosecutor stated in rebuttal argument: "When a man does not want to say anything to the police until he finds out what the police know, I think that's worth thinking about." The courts have repeatedly said that no inference can be drawn from the defendant's silence prior to trial. "If the fifth amendment means anything, it not only means that the defendant has the right to refrain from making statements that might tend to incriminate him, but it also means that the exercise of that right will not be used against him later in a criminal proceeding." *Neely v. State*, 86 Wis. 2d 304, 316, 272 N.W.2d 381, 386 (Ct. App. 1978), *aff'd*, 97 Wis. 2d 38, 292 N.W.2d 859 (1980).

The prosecutor, however, asked the jury to infer guilt from Wulff's refusal to answer the investigating officer's questions until he knew what evidence the police had. However, that right is clearly protected by the Fifth Amendment.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

I do not believe this error can be considered harmless. As is usually true in sexual assault cases, this became a credibility contest between the alleged victim and the defendant. The alleged victim's credibility was very much in doubt considering the circumstances surrounding the alleged assault. She admitted she was very drunk and couldn't remember what happened. The State presented three theories to the jury: attempted sexual contact, attempted sexual intercourse by fellatio and attempted sexual intercourse by genital or anal penetration. The State had to prove each theory beyond a reasonable doubt. *See State v. Crowley*, 143 Wis. 2d 324, 334, 422 N.W.2d 847, 851 (1988). Thus, the State had to show that Wulff attempted to penetrate the victim genitally or anally. The only evidence to support that charge was the victim's testimony that her tampon was missing. However, there was no evidence that Wulff removed her tampon and, in fact, the tampon was never introduced, nor did the victim testify as to what happened to the tampon.

The prosecutor attempted to fill the evidentiary vacuum with Wulff's silence. That effort can hardly be harmless error.

The State could use post-*Miranda* silence only to contradict an exculpatory version of events which a defendant claims he gave to the police. *See Doyle v. Ohio*, 426 U.S. 610, 619 n.11 (1976).

The State also argues (although not very strenuously) that Wulff waived the error by failing to object to the prosecutor's argument. The error vitiating defendant's Fifth Amendment rights is so fundamental that he must be granted a new trial. *See State v. Vinson*, 183 Wis. 2d 297, 303, 515 N.W.2d 314, 317 (Ct. App. 1994).

For these reasons, I respectfully dissent.