STATE of Wisconsin, Plaintiff-Respondent,

v.

Caltone K. COCKRELL, Defendant-Appellant.†

Court of Appeals

*No. 2005AP2672–CR. Submitted on briefs June 13, 2007.
—Decided September 20, 2007.*

2007 WI App 217

(Also reported in 741 N.W.2d 267.)

† Petition to review denied 12/19/07.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Paul R. Nesson*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Juan B. Colas*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Higginbotham, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. Caltone K. Cockrell appeals the judgment of conviction and sentence for attempted second-degree intentional homicide, first-degree recklessly endangering safety, and endangering safety by use of a firearm.[1] He contends the prosecutor impermissibly cross-examined him and commented in closing argument on his post-*Miranda* silence, and the jury instruction did not adequately explain to the jury the limited permissible purpose of the cross-examination comment on his silence. He also contends the prosecutor's comment in closing argument on his wife's non-appearance at trial was improper.

¶ 2. We conclude: (1) neither the cross-examination of Cockrell nor the prosecutor's challenged closing comments violated Cockrell's right to due process by impermissibly exploring his post-*Miranda* silence because both were a fair response to the testimony he offered on direct examination; (2) Cockrell did not preserve his objection to the jury instruction for review as required by WIS. STAT. § 805.13(3); and (3) the prosecutor's comments on Cockrell's wife's non-appearance was a permissible comment on the evidence. Accordingly we affirm.

---

[1] These are violations of WIS. STAT. § 940.05(1)(a) (2005–06) and WIS. STAT. § 940.46, WIS. STAT. § 941.30(1), and WIS. STAT. § 941.20(2)(a), respectively. All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

## BACKGROUND

¶ 3. Zahmall Davis was injured when Cockrell fired shots into the car Davis was driving, which was stopped at a McDonald's drive-through in Madison. Davis's girlfriend was in the passenger seat of the car and was not injured. Cockrell was in the rear passenger seat of a minivan driven by Champagne Jones, his fiancée at that time and his wife at the time of trial.[2] A neighbor was in the front passenger seat of the minivan.

¶ 4. Ten days after the shooting, Cockrell turned himself in to the Madison Police Department and was interviewed by two detectives. He was advised of his *Miranda* rights and proceeded to describe incidents that occurred during the weeks before the shooting, including incidents in which Davis threatened him verbally and with a gun, and an incident in which someone, whom he believed to be Davis, shot at his car while it was parked in front of his house. Although Cockrell agreed to talk about the events before the day of the shooting, he told the detectives he did not want to talk about the incident at McDonald's until he had an attorney.

¶ 5. The case was tried to a jury over four days. Davis testified that he was at the drive-thru when the slide door of the van that pulled up next to him opened and a man, whom he did not recognize then, pointed a shotgun at him. Davis told his girlfriend to get down and a shot hit him on the right side of his face. He tried to get out of the driver's door, but a second shot hit his back.

¶ 6. Cockrell's defense was that he acted in self-defense. He told the jury that the incident at

---

[2] After Caltone Cockrell and Champagne Jones married, her name became Champagne Cockrell. However, we refer to her as Jones in this opinion to distinguish her from Caltone, whom we refer to as Cockrell.

McDonald's began when the minivan pulled into the McDonald's lot so that he, Jones, and their neighbor could get something to eat. He recognized Davis's car and the minivan pulled up adjacent to the car. Cockrell started to get out and saw a male in the back seat of Davis's car pointing a shotgun at him, so he reached back into his car for his shotgun and fired at the man. He fired a second shot toward Davis because he saw Davis reaching down under the seat. Cockrell identified the man in the back seat as Leon Swanagan, who had testified earlier in the trial. Swanagan had been called by the defense but was declared a hostile witness. Swanagan testified at trial that he was not at McDonald's at the time of the shooting, although he acknowledged he had told investigators he had been there that day.

¶ 7. Cockrell testified that after the shooting he left Madison to visit his brother for advice, then came back and turned himself in to the police. Cockrell testified that when the detectives began asking him questions about the incident at McDonald's, he said he would tell them about everything up until that point, but he did not want to incriminate himself so he was not going to say anything about that until he had an attorney. He explained that he did not want to talk about that unless he had counsel because things can be misinterpreted or written down incorrectly. Cockrell described the prior incidents with Davis that he had told the police about in the interview and testified that he and his family were terrified.

¶ 8. On cross-examination, the prosecutor elicited, without objection, Cockrell's admission that he did not tell the police that a man in the back seat of Davis's car was pointing a gun at him. During closing arguments, the prosecutor suggested that Cockrell's failure

to tell the police about the man in the back seat was an indication that he was fabricating that story.

¶ 9. Jones was subpoenaed by the State, but she did not appear. During closing arguments, the prosecutor described her as "refusing" to honor her subpoena and suggested that her testimony would not have been favorable to Cockrell.

¶ 10. The jury returned a verdict of guilty of attempted second-degree intentional homicide, first-degree recklessly endangering safety, and endangering safety by reckless use of firearm.

## DISCUSSION

¶ 11. On appeal, Cockrell contends that the prosecutor's cross-examination and closing argument violated his Fifth Amendment right to remain silent because the prosecutor was in essence arguing that his silence to the police was inconsistent with his claim of innocence. The State responds that, in testifying on direct about his decision to remain silent, Cockrell exposed himself to questioning on the topic, and the cross-examination and closing argument were a permissible attack on his credibility.

¶ 12. Cockrell also contends the jury instruction the court gave on his post-*Miranda* silence was inadequate. The State counters that the jury instruction was an adequate statement of the law.

¶ 13. Finally, Cockrell challenges the prosecutor's characterization of Jones's failure to honor the State's subpoena as a "refusal" to appear, arguing that the prosecutor injected facts into his argument that were not in evidence and impermissibly asked the jury to draw adverse inferences from her absence. The State responds that the prosecutor's argument was a permissible comment on the evidence.

## I. Use of Cockrell's Post-*Miranda* Silence

### A. Applicable Law

¶ 14. Although Cockrell describes his challenge to the prosecutor's use of his post-*Miranda* silence as a violation of his Fifth Amendment right to remain silent, the substance of his argument is the due process analysis employed in *Doyle v. Ohio*, 426 U.S. 610 (1976), which we applied in *State v. Wulff*, 200 Wis. 2d 318, 546 N.W.2d 522 (Ct. App. 1996), and *State v. Nielsen*, 2001 WI App 192, ¶ 31, 247 Wis. 2d 466, 634 N.W.2d 325, the two cases on which Cockrell primarily relies. Cockrell does not cite to any cases that do not use the *Doyle* due process framework to analyze a prosecutor's use of a defendant's silence to cross-examine the defendant and in closing argument.[3] Therefore, we analyze Cockrell's challenge under the due process clause of the Fourteenth Amendment. The application of constitutional principles to undisputed facts presents a question of law, which we review de novo. *See Nielsen*, 247 Wis. 2d 466, ¶ 32.

¶ 15. In *Doyle*, the Court held the defendant's right to due process was violated by the prosecutor eliciting on cross-examination of the defendant, who

---

[3] In *State v. Nielsen*, 2001 WI App 192, 247 Wis. 2d 466, 634 N.W.2d 325, the issue involved the cross-examination of a defense witness, the detective who interviewed the defendant, not cross-examination of the defendant. We framed the issue as whether the cross-examination of that witness "constituted a violation of [the defendant's] right to remain silent," *id.*, ¶ 28, but we employed the analysis of *Doyle v. Ohio*, 426 U.S. 610 (1976), and a federal case applying *Doyle, United States v. Gant*, 17 F.3d 935 (7th Cir. 1994), without mentioning they were based on the right to due process. *Nielsen*, 247 Wis. 2d at 487.

had remained silent after being advised of his *Miranda* rights, that he had not told the police officer someone had framed him. 426 U.S. at 612–14, 619–20. The Court rejected the prosecutor's argument that it was permissible to elicit the post-arrest silence for the purpose of impeaching the defendant's trial testimony as recently fabricated. *Id.* at 616–17. The Court's rationale was that it was fundamentally unfair to advise a person that he or she had the right to remain silent and then to use that silence to impeach testimony offered at trial. *Id.* at 617–18. However, the Court stated in a footnote,

> It goes almost without saying that the fact of post-arrest silence[4] could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge defendant's testimony as to his behavior following arrest. *Cf. United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975).

*Id.* at 619 n.11 (footnote added).

¶ 16. Building on footnote 11 in *Doyle*, courts have recognized situations in which it is not a violation of due process for the prosecutor to elicit on cross-examination the fact of the defendant's post-*Miranda* silence for the purpose of impeaching the defendant's testimony about his or her interactions with the police after the arrest. One situation is where the defendant's testimony conveys that he or she cooperated with the police; it is not then fundamentally unfair for the

---

[4] Subsequently in *Fletcher v. Weir*, 455 U.S. 603, 607 (1982), the Court held that *Doyle* applied only where the person had been given *Miranda* warnings, not to post-arrest silence where no *Miranda* warnings had been given.

prosecutor on cross-examination to elicit, or in closing argument to comment upon, the fact that the defendant was non-responsive or remained silent in answer to certain questions. *Wulff* and *Nielsen* fall into this category. In *Wulff*, 200 Wis. 2d at 344, the defendant's opening statement, testimony, and closing argument emphasized his cooperation with the police. The prosecutor in closing asked the jury to think about the fact that the defendant said he could not remember things when he talked to the police soon after the charged incident, but gave detailed trial testimony on those points months later; and the prosecutor suggested that the defendant fabricated those details after he learned what the police knew. *See id*. at 343–44. We held these comments were permissible, applying *Doyle* and federal cases following *Doyle*. *See id*. at 338–44 (in addition to *Doyle*, we applied *United States v. Gant*, 17 F.3d 935 (7th Cir. 1994), and *United States v. Allston*, 613 F.2d 609 (5th Cir. 1980)).

¶ 17. Other situations in which courts have found no violation of due process under *Doyle* include those where the defendant volunteered on direct his reason for not telling the police his version of the crime, *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651 (7th Cir. 1983), and where the defendant testified that he attempted to tell the officers what happened but they would not let him speak. *United States v. Mavrick*, 601 F.2d 921 (7th Cir. 1979).

■

¶ 18. However, even if the defendant "opens the door" to cross-examination or closing argument on his post-*Miranda* silence, to be permissible under the due process clause, the State's response must be directed at impeaching the defendant's credibility regarding his testimony. *See United States v. Shue*, 766 F.2d 1122,

1130–32 (7th Cir. 1985) (it was fundamentally unfair for the State to go beyond impeaching the defendant's credibility on his testimony regarding cooperation and to suggest that the defendant's silence upon arrest is inconsistent with innocence); *see also Gant*, 17 F.3d at 942–43 (cross-examination to rebut defendant's testimony that he was available to police and that their lengthy investigation was unduly harassing was permissible; closing argument that his "silence was 'consistent' with the behavior of a confederate in crime" was impermissible but harmless).

¶ 19. The Seventh Circuit Court of Appeals has aptly articulated the proper analysis for deciding whether the State's use of a defendant's post-*Miranda* silence violates due process: we "balanc[e] [the] defense and prosecution interests and [apply] considerations of fairness within the context of the truth-seeking function of trials." *Mavrick*, 601 F.2d at 933.

### B. Cross-Examination and Closing Argument

¶ 20. The officer who interviewed Cockrell when he came to the police station testified for the State about what Cockrell told her regarding Davis's behavior in the weeks before the shooting and his reaction to it. She did not mention that Cockrell declined to talk about the shooting itself. Cockrell, on direct, made the first mention of this. After explaining how he turned himself in he stated:

> Well, they started asking me a series—a series of questions. And they started asking me about, you know, what happened, what happened at the McDonald's shooting—I mean, what happened at the McDonald's, what took place, why did it take place, where's the weapon, and things like that.

And at that point, I had told them and indicated to them that I would tell you everything up until that point.

¶ 21. After Cockrell testified, still on direct, about the incidents involving Davis in the weeks before the shooting and Cockrell's fear of Davis, his attorney returned to the topic of Cockrell declining to speak to the officers:

Q. All right. Did Detective Petzold ask you what happened in the McDonald's?

A. Yes.

Q. What did you tell her?

A. I told her at that point in time that I didn't want to say anything that was going to incriminate myself, so therefore I told her that I'm not going to speak no more unless I had counsel.

Q. Okay. Why did you—Why did you feel the necessity to say that to her?

A. Because, you know, you can say one thing, and it can come out another way. Somebody can interpret what you said and write it totally different from the way you're saying it.

Q. Did you say anything else about the incident to Detective Petzold about how you felt about the incident?

A. Well, I told her that I was very terrified, and I was scared for—My life was threatened.

Following this interchange, Cockrell described his version of the events at McDonald's, which we have already recounted in paragraph 6.

¶ 22. On cross-examination, the prosecutor brought up Cockrell's interview with the detectives and Cockrell acknowledged that they said they wanted to hear his side of the story. After Cockrell said that "he was answering the questions that they [were giving]," these questions and answers followed:

Q. And you refused to answer some questions, correct?

A. Without a counsel.

Q. At some point did you get an attorney in this case?

A. Yes.

Q. And did you ever come back and make another statement to police?

A. No.

. . . .

Q. When Detective Johnson or Detective Petzold asked you specifically about what happened at McDonald's you never told them about a third person in the Sebring?

A. Nope.

Q. You never told them about seeing a shotgun in the [car Davis was driving]?

A. I never told anybody about it . . . .

The prosecutor asked additional questions along the same lines, with Cockrell giving essentially the same answers.

¶ 23. On redirect, Cockrell confirmed that he did not talk about "the McDonald's shooting at all" with the detectives because he wanted to be represented by

counsel, and on recross he confirmed that, after he was represented by counsel, he never said anything further.

¶ 24. Cockrell argues that the cross-examination was improper because he did not testify that he cooperated with police, but instead accurately stated that he had declined to answer questions about the incident. Therefore, he asserts, unlike *Wulff* and *Nielsen*, there was no reason to impeach his credibility on that point and the cross-examination had the impermissible purpose of suggesting he fabricated his trial testimony. That suggestion of fabrication, he contends, was emphasized in this portion of the prosecutor's rebuttal in closing argument:

> Eleven days after the shooting he turned himself in. Nobody disputes he turned himself in. And what did he do when he turned himself in? He gave a self serving statement about a guy and he, a guy and he. *Yesterday, a little over 15 months after the shooting, what does he all of a sudden tell you about? Another guy*, another guy I don't know, another guy I didn't see, another guy I never said anything about feeling in danger of, another guy with a shotgun. But his lawyer doesn't ask him to identify the shotgun because Mr. Cockrell knows it is inoperable.[5] Another guy who all of a sudden I recognize, and all of a sudden I say, ah. that's him. . . .that's the person. I didn't recognize his photograph, but I know him now.[6]

---

[5] When police investigated the car Davis was driving after the shooting—the car belonged to Hermanson—they found an inoperable shotgun in the back seat of the car. Both Hermanson and Davis testified that it was not in the car when they were at McDonald's.

[6] Cockrell testified that, before he saw Swanagan in the courtroom during the trial, his attorney had shown him a picture of Swanagan, but he did not recognize the person in the picture.

(Emphasis added by Cockrell; footnotes added by opinion author.)

¶ 25. Cockrell contends the use of his post-*Miranda* silence to suggest that he fabricated the events forming the basis for his claim of self-defense is impermissible because it is asking the jury to infer from his post-arrest silence that he is guilty.[7]

---

[7] Cockrell did not object to the cross-examination, except when the questions might imply that the prosecutor was asking whether he told his attorney about the incident at McDonald's, and the court sustained those objections. In a break shortly after Cockrell testified for the first time on direct that he told the detectives he "would tell [you] everything up until that point," the prosecutor advised the court and defense counsel that he believed that, by disclosing to the jury that Cockrell had declined to answer questions at a certain point, Cockrell had "opened the door [to the prosecutor] asking him on cross-examination or Detective Johnson or Petzold on rebuttal about the questions he refused to answer." Defense counsel stated he had no objection.

Although the State does not argue waiver with respect to Cockrell's objection on appeal to the cross-examination, it appears that Cockrell has waived the right to argue on appeal that the circuit court erred in permitting the cross-examination he now challenges.

As for objections to the closing argument, although Cockrell did not object to the portion of the closing argument quoted in ¶ 24, just preceding these comments the prosecutor made essentially the same argument and Cockrell objected. The court responded by saying, "You folks remember the testimony as you heard it." The ground for Cockrell's objection seems ambiguous, but the State does not argue that Cockrell did not preserve for review the challenge he now makes to the quoted comments of the closing argument.

Because the State does not assert waiver and because it is necessary to address the propriety of the cross-examination in

¶ 26. We agree with Cockrell that this case presents a significantly different fact situation than that in *Wulff* and *Nielsen*. It is evident that Cockrell wanted the jury to hear that he turned himself in to the police and that he told the police about Davis's behavior in the weeks before the shooting and about his fear of Davis. Because this suggests that Cockrell cooperated with the police, the State could have permissibly brought out in response that Davis declined to answer questions about the shooting incident itself. Perhaps realizing this, the defense chose to have Cockrell volunteer this on direct—unlike in *Wulff* and *Nielsen*. However, Cockrell did more than volunteer that he declined to answer questions about the shooting: he explained why he declined—that he wanted an attorney present so his story would not be misinterpreted.

¶ 27. Although this fact situation is significantly different from that in *Wulff* and *Nielsen*, it does not necessarily follow, as Cockrell appears to believe, that the cross-examination was improper. The "cooperation" situation is not the only situation in which courts have found a permissible use of a defendant's post-*Miranda* silence for impeachment purposes. Indeed, *Saulsbury*, 702 F.2d 651, addresses a situation similar to this case.

¶ 28. In *Saulsbury*, the defendant took the stand and testified that he stabbed the victim in self-defense. 702 F.2d at 652. When defense counsel asked why he did not volunteer after his arrest any explanation of the

order to fully analyze Cockrell's objection to the State's closing argument, which he arguably preserved, we choose to address Cockrell's challenge to the cross-examination and closing argument. *See State v. Freymiller*, 2007 WI App 6, ¶¶ 16–17, 298 Wis. 2d 333, 727 N.W.2d 334 (the waiver rule is a rule of judicial administration and we may in our discretion address the merits of an unpreserved issue). *But see* ¶ 36, *infra*, regarding waiver of objection to jury instructions.

fight, he answered that the sheriff read him his rights and told him that what he said could be used against him, and he did not think the sheriff would believe him because he was on parole. *Id.* On cross-examination, the State elicited that, although the sheriff did not tell the defendant the victim had died, the defendant knew this when the charge of murder was brought, but he still did not talk to the sheriff. *Id.* The prosecutor argued that the reason the defendant gave for not initially telling the sheriff that he acted in self-defense could not be the reason that he failed to tell him even after he was charged with murder. *Id.* "The thrust of the [prosecutor's] argument was that the jury should not believe the defendant's story because, by then, someone charged with murder would have claimed self-defense if in fact that is what happened." *Id.* at 652–53.

¶ 29. The court in *Saulsbury* concluded that the cross-examination and closing argument were not fundamentally unfair. *Id.* at 655–56. The court reasoned that, once the defendant initiated the topic of why he chose to remain silent, his explanation put him in a better position than had he not mentioned the reason; it was not then fundamentally unfair for the State on cross-examination to attack the credibility of that explanation by eliciting the testimony that, even after there was a compelling need for him to come forward with his self-defense version of the fight, he did not. *Id.* As for the closing argument, the court found this "particularly troublesome because of its ambiguity."[8] *Id.*

---

[8] The comments the court found "troublesome" in *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651, 653 n.1 (1982), though not a basis for reversal, included the closing comment that

[I]n order to believe . . . the defendant, and you have to believe him or he is guilty . . . you have to disbelieve [sic] that an innocent

68

at 656. However, given the difficulty of separating the permissible attack on the defendant's credibility from the suggestion that an innocent person would have come forward earlier, the court concluded that the closing argument was constitutionally permissible. *See id.* at 656.

■

¶ 30. In our case, similar to *Saulsbury*, the prosecutor sought on cross-examination to attack the credibility of the reason Cockrell offered for not talking to the police: he elicited the information that, even after Cockrell obtained counsel and therefore presumably had help in making sure his words were not misinterpreted, he still did not tell the police about the man in the back seat pointing a gun at him. It is true that, if the jury disbelieved Cockrell's reason for not telling the police about the man in the back seat, the jury might believe that the real reason he did not tell the police is that there was no man in the back seat. We agree with Cockrell that this suggestion of fabrication is implicit in the cross-examination and is the thrust of the challenged portion of the prosecutor's rebuttal. However, we do not agree this is fundamentally unfair. Had Cockrell said nothing about declining to talk to the police about the shooting incident itself, the State under *Doyle* could not have used Cockrell's post-*Miranda* silence to suggest that his trial testimony about the man in the back seat was fabricated. However, Cockrell chose to volunteer what he did and did not say to the police and why. In these circumstances it is not fundamentally unfair to

party would have acted the same way that [he] did in not telling anyone about his defense until he took the stand here for trial even after he had been arrested.

(First ellipses added.)

69

permit the State to "explor[e] the soundness of that explanation [for not telling the police that he acted in self-defense] by measuring it against the defendant's subsequent failure to assert it . . . [after he obtained counsel]." *Saulsbury*, 702 F.2d at 656.

¶ 31. We now turn to Cockrell's contention that the suggestion of fabrication is the equivalent of asking the jury to infer Cockrell's guilt from his post-*Miranda* silence. We have, like other courts, recognized that "the distinction between the use of silence to impeach . . . and the use of silence as evidence of guilt is one laden with both theoretical and practical difficulties." *Wulff*, 200 Wis. 2d at 343 (quoting *Gant*, 17 F.3d at 942). The difficulties arise because "at least some suggestion of guilt is 'inextricably intertwined' with any use of post-arrest silence to impeach credibility."[9] *Id*. (citations omitted). However, as long as the prosecutor does not ask the jury to make a direct inference of guilt from the

_____

[9] The phrase "inextricably intertwined" is from the dissent in *Doyle*, 426 U.S. 610, 635–36, (Stevens, J., dissenting). In the *Doyle* dissent's view, there was no due process violation and the dissent thus took up the claim that there was a Fifth Amendment violation of the defendant's privilege against self-incrimination. *Id*. at 620. The dissent concluded the cross-examination did not violate the Fifth Amendment but viewed the prosecutor's argument to the jury as going beyond "proper comment upon the defendant's silence . . . as inconsistent with his testimony that he had been 'framed,' " and as suggesting that it was also "inconsistent with the defendant's innocence." *Id*. at 634–35. It was in this context that the dissent observed that the improper inference of guilt and the proper inference of perjury were "inextricably intertwined" in that the two inferences have "a common source." *Id*. at 635–36. Because of that "rather sophisticated distinction," the dissent concluded that, viewing the entire argument and trial, it would not reverse based on the prosecutor's impermissible comments. *Id*. at 636.

70

defendant's post-arrest silence, asking the jury to draw inferences that impeach the defendant's volunteered testimony on that subject does not violate due process, even though the inferences, if accepted by the jury, might make it more likely it will find the defendant guilty. *See Wulff*, 200 Wis. 2d at 343–44.

¶ 32. In this case, the prosecutor wanted the jury to infer that Cockrell was not telling the truth as to why he did not tell the police about the man in the back seat. It is true that, if the jury accepted these inferences, it was more likely to decide Cockrell did not act in self-defense but was instead guilty of attempted homicide. However, we do not agree that this is the same as asking the jury to make a direct inference of guilt from Cockrell's silence.

---

Although the *Doyle* dissent's discussion of the distinction between the permissible use for impeachment of the defendant's trial testimony and the impermissible use to infer guilt took place in the context of its analysis of the Fifth Amendment, which the majority did not address, courts frequently refer to this distinction in deciding upon the permissible use of a defendant's post-*Miranda* silence under the due process analysis of the *Doyle* majority. We did so in *State v. Wulff*, 200 Wis. 2d 318, 343, 546 N.W.2d 522 (Ct. App. 1996). However, on closer examination we question whether the distinction is helpful in applying a due process analysis. The two are always inextricably intertwined in the sense that the chain of inferences a jury might reasonably draw from impeachment of a defendant lead to—and are intended by the prosecutor to lead to—an inference of guilt. However, under the *Doyle* due process analysis, use of a defendant's post-*Miranda* silence for impeachment is nonetheless permissible if it is a fair response to the defendant's volunteered testimony. It seems more useful to focus on the permissible—that is, fair—scope of impeachment in the particular case than on trying to draw a line between an indirect and direct inference of guilt.

¶ 33. The due process inquiry under *Doyle* is whether the cross-examination of Cockrell or the challenged comments in closing argument were fundamentally unfair to Cockrell given his volunteered testimony on declining to talk to the police about the shooting and his reason for that. Balancing the defense and prosecution interests and applying "considerations of fairness within the context of the truth-seeking function of trials[,]" *Mavrick*, 601 F.2d at 933, we conclude the challenged cross-examination and closing argument, regarding Cockrell's post-arrest silence, were not fundamentally unfair.

## II. Jury Instruction

¶ 34. Cockrell argues that the jury instruction on his post-*Miranda* silence erroneously failed to inform the jury that the State's questioning regarding that silence could be considered solely with respect to impeaching his credibility. The instruction informed the jury: " . . . You must not consider that decision by Mr. Cockrell to seek the assistance of counsel [when questioned by the detective] to in any sense be evidence of guilt as to any charge." However, according to Cockrell, the instruction did not adequately explain to the jury why the prosecutor had been allowed to question Cockrell on his silence.[10]

---

[10] The complete instruction provided:

In the course of the direct examination of Mr. Cockrell, he stated that he voluntarily came in to meet with Madison Police Detectives Sara Petzold and Jerry Johnson. He stated, and other witnesses agree, that he answered some questions asked but chose not to answer other questions. He has testified that he did so because he did not at that time have the assistance of counsel. At the time he met with the detectives, Mr. Cockrell was facing the possibility of serious criminal charges. The opportunity to seek

¶ 35. We have reviewed the transcript and see no indication that Cockrell objected to the jury instruction the court gave. As initially proposed by the court, the last sentence of the instruction had this italicized language at the end: "You must not consider that decision by Mr. Cockrell to seek the assistance of counsel [when questioned by the detective] to be in any sense evidence of guilt as to any charge[,] *or as a basis to question his credibility as a witness.*" The prosecutor objected to the italicized phrase as an erroneous statement of the law. Defense counsel asked that the instruction be given as proposed by the court. After more argument from the prosecutor on his objection to the italicized phrase, the prosecutor asked the court to add this sentence in addition to striking that phrase: "You may, as with any witness . . . consider evidence of his prior statements in assessing his credibility." The court decided to strike the italicized phrase and not add anything. The defense counsel made no objection when the court announced its intention and never proposed any added or substitute language.

¶ 36. Under Wis. Stat. § 805.13(3) the failure to object to a jury instruction the court proposes to give constitutes a waiver of any error in the proposed instruction.[11] "The purpose of the rule [in § 805.13(3)]

counsel, the assistance of an attorney and the right to refuse to answer questions with that assistance of counsel is a crucial, extremely important right that is guaranteed in the basic framework of our society and our constitution. Mr. Cockrell did absolutely nothing wrong in choosing to seek the assistance of counsel when questioned by the detectives. You must not consider that decision by Mr. Cockrell to seek the assistance of counsel to in any sense be evidence of guilt as to any charge.

[11] Wisconsin Stat. § 805.13(3) provides:

is to afford the opposing party and the trial court an opportunity to correct the error and to afford appellate review of the grounds for the objection." *Air Wisconsin, Inc. v. North Cent. Airlines, Inc.*, 98 Wis. 2d 301, 311, 296 N.W.2d 749 (1980). This court does not have the power to review this type of waived error.[12] *Gosse v. Navistar Int'l Transp. Corp.*, 2000 WI App 8, ¶ 19, 232 Wis. 2d 163, 605 N.W.2d 896. We conclude that Cockrell waived his objection to the jury instruction and we do not review it.

III. Prosecutor's Closing Argument on Jones

¶ 37. When Cockrell's wife, Jones, did not appear in response to the State's subpoena, the court informed

---

(3) INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.

This statute applies to criminal proceedings. *See State v. Schumacher*, 144 Wis. 2d 388, 402, n.11, 424 N.W.2d 672 (1988).

[12] Although we do not have the common law power to review this type of waived error, we may exercise our discretionary power of reversal under WIS. STAT. § 752.35 when a waived error regarding a jury instruction results in the real controversy not being tried. *Gosse v. Navistar Int'l Transp. Corp.*, 2000 WI App 8, ¶ 19 n.6, 232 Wis. 2d 163, 605 N.W.2d 896. However, Cockrell does not contend that the real controversy was not tried because of the challenged jury instruction.

74

the jury, based on the agreement of the parties, that "a subpoena was served ... on behalf of the District Attorney's office on Champagne [Jones] directing that she be here for this trial and available to testify, and she has not appeared."

¶ 38. In the prosecutor's rebuttal in closing argument, he stated:

> You know, there was one person who was in that van the night this happened who you didn't hear from, that didn't show up for her subpoena. That's the defendant's wife. What does that tell you?

¶ 39. Defense counsel objected on the ground that the jury had been instructed on this and it was improper to have the jury infer anything from the fact that she did not show up. The court overruled the objection and the prosecutor continued:

> She refused to honor a subpoena. What does that tell you? Somebody else who could shed light on this, somebody connected to the defendant.

¶ 40. Cockrell argues that these comments are improper because the only evidence before the court was that Jones "ha[d] not appeared"; the jury was not told she had "refused to appear." According to Cockrell, the prosecutor was therefore asking the jury to draw an inference from a fact not in evidence and it was an inference prejudicial to him—that her testimony would have been unfavorable to him.

■■■■■

¶ 41. Generally, counsel is allowed latitude in closing argument and it is within the trial court's discretion to determine the propriety of counsel's statements and arguments to the jury. *State v. Wolff*, 171

Wis. 2d 161, 167, 491 N.W.2d 498 (Ct. App. 1992). A prosecutor may comment on evidence and argue from it to a conclusion. *State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979). A prosecutor may not, however, suggest that the jury arrive at its verdict by considering factors other than the evidence.[13] *Id.*

¶ 42. We conclude that the prosecutor was not asking the jurors to draw inferences from facts not in evidence. The jury was instructed that Jones was served with a subpoena by the State and had not appeared. The jury also learned through Cockrell's own testimony that Jones was his girlfriend at the time of the shooting, that she was driving the car at the time of the shooting, and that they had since married. It is reasonable to infer from this evidence and the court's instruction that Jones refused to honor the subpoena. The jury could infer that Jones knew she was supposed to be at the trial; that her husband's trial would be a significant event and not likely one she would forget or not make arrangements for if she wanted to be there; and that she lived in Madison with Cockrell, where the trial was held, and thus getting to the courthouse would not be difficult.

¶ 43. Cockrell also challenges the inference the prosecutor asked the jury to draw from Jones's "refusal" to appear—that her testimony would be unfavorable to Cockrell—because, Cockrell asserts, it improperly suggests that if her testimony would have been favorable to him, he would have called her. In support of this

[13] Even if the circuit court has misused its discretion, we do not reverse unless that misuse of discretion is likely to have affected the jury's verdict. *State v. Neuser*, 191 Wis. 2d 131, 136, 528 N.W.2d 49 (Ct. App. 1995).

argument, Cockrell cites to the recommendation of the Criminal Jury Instructions Committee that the "missing witness" instruction no longer be given against the defendant because drawing an adverse inference from the failure of a defendant to call a witness is "difficult to square" with the principles that the defendant need not testify and need not call witnesses on his or her behalf. WIS JI—CRIMINAL 345.

¶ 44. We do not agree with Cockrell that the prosecutor was asking the jury to draw an adverse inference from his failure to call Jones as a witness. The prosecutor was asking the jury to draw an adverse inference from her failure to appear in response to the State's subpoena. We see nothing improper in this argument and conclude the circuit court's overruling of the objection was not a misuse of discretion.[14]

## CONCLUSION

¶ 45. We conclude: (1) neither the cross-examination of Cockrell nor the prosecutor's challenged

---

[14] The State also argues that Cockrell waived his right to object on this ground because he did not move for a mistrial. We agree with Cockrell that the case the State relies on for this argument, *State v. Davidson,* 2000 WI 91, ¶ 86, 236 Wis. 2d 537, 613 N.W.2d 606, does not support the State's position. In *Davidson,* the defense counsel's objections to the prosecutor's comments in closing argument were sustained and the defense counsel moved on without asking for a mistrial; the court held this was a waiver. *Id.,* ¶ 5. The rationale for finding a waiver in this circumstance is that, when the court sustains the objection, without a request for a mistrial "all [the court] can assume is that the defendant was satisfied with the court's ruling and curative measure, and that he had no further objections." *Neely v. State,* 97 Wis. 2d 38, 55, 292 N.W.2d 859 (1980), *see also Davidson,* 236 Wis. 2d 537, ¶ 86. This rationale does not apply when the court has overruled the objection, as it did here.

closing comments violated Cockrell's right to due process by impermissibly exploring his post-*Miranda* silence because both were a fair response to the testimony he offered on direct examination; (2) Cockrell did not preserve his objection to the jury instruction for review as required by WIS. STAT. § 805.13(3); and (3) the prosecutor's comments on Cockrell's wife's non-appearance was a permissible comment on the evidence. Accordingly, we affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.