**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 27, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2018AP615-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2014CF3157

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

JOSE ANTHONY GUZMAN,

      DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County:  CAROLINA STARK, Judge.  *Affirmed*.

Before Brash, P.J., Kessler and Brennan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Jose Anthony Guzman appeals from a judgment, entered upon a jury's verdict, convicting him on one count of first-degree sexual

assault of a child less than sixteen years old. Guzman also appeals from an order denying his postconviction motion without a hearing. Guzman contends that trial counsel was ineffective for failing to call two witnesses, for failing to elicit additional testimony from the crime lab analyst, and for failing to object to a portion of the State's closing argument. We disagree with Guzman's arguments, and we affirm the judgment and order.

## BACKGROUND

¶2 Around 6:00 p.m. on July 18, 2014, then-thirteen-year-old I.M. was on the front stairs of the duplex where she lived with her family in the upper unit. She had intended to go to the store with her grandfather, who lived a few houses away, but he had already left. I.M.'s mother was upstairs, sleeping after returning from work, and I.M. had locked herself out, so she was waiting on the stairs for a friend.

¶3 As I.M. was waiting, she saw a man—later identified as Guzman—park his car and make a phone call. After he ended the call, he came over to I.M. and started to ask her about a "for rent" sign in the yard. She explained that it was not for the duplex but for another house on the same lot. Guzman told I.M. that she was pretty and asked if she had a boyfriend. Guzman then went to his car to grab a piece of cardboard on which he wrote his phone number. He gave the number to I.M. so her mother could call him about the rental property.

¶4 I.M. stated that after Guzman gave her his phone number, he gave her two dollars, then grabbed her hand and put it on his penis. She said he pulled down his shorts and held both of her hands on his penis, moving her hands up and down three or four times while telling her that he loved her. I.M. also said that he kissed her and rubbed his penis against her. Guzman then left.

¶5     I.M. told her mother and grandfather what happened.  They called Guzman's phone number and he returned.  As Guzman walked back to the house, he was confronted by Israel Nunez-Otero, a neighbor and friend of I.M.'s mother. Guzman initially tried to flee but was grabbed by Nunez-Otero, who held Guzman down until police arrived.  Guzman was arrested and charged with one count of first-degree sexual assault of a child less than sixteen years old.

¶6     I.M.'s grandfather, M.M., testified at trial.  M.M. said he returned home about 6:00 p.m. the day of the incident, and I.M. ran up to him, crying.  She told him what had happened.  He punched his truck, which caught the attention of Nunez-Otero.   M.M. testified that he helped hold Guzman down until police arrived.  M.M. also testified that, as they held Guzman, Guzman kept saying "tell her I'm sorry" and that he did not want to go to jail.

¶7     State Crime Lab Analyst Michelle Burns testified regarding DNA evidence.  I.M.'s pants had been swabbed in the crotch and fly areas, as well as inside and outside the waistband.  Only the inside of the waistband yielded enough material for testing.   The DNA was consistent with having come from two individuals, but there was insufficient material to make either inclusionary or exclusionary identifications.  The analyst testified that there was at least one male contributor, but she could not say conclusively whether the entire sample was a mix of male and female DNA or a mix of DNA from multiple males.  I.M.'s hands were also swabbed for DNA.  No DNA was recovered from her right hand.  There was a trace amount of male DNA on her left hand but, like the waistband sample, it was too small of a sample to make any comparisons.

¶8     Burns's report was also admitted at trial.  Among other things, this report noted that the DNA mixtures from both I.M.'s waistband and her left hand

showed a "partial Y-STR DNA profile that is a mixture of DNA from at least two male individuals." Burns did not testify about the Y-STR results. In its closing argument, the State acknowledged that there was "no smoking gun" from the DNA evidence, but asked the jury to consider "what other male could she have possibly gotten this DNA on her palm from." The jury convicted Guzman as charged, and he was sentenced to fourteen years' initial confinement and six years' extended supervision.

¶9 Guzman then filed a postconviction motion, alleging ineffective assistance of trial counsel. He claimed trial counsel was deficient for failing to: (1) call Nunez-Otero as a witness because Nunez-Otero told police that when he approached and confronted Guzman, Guzman responded, "I didn't touch anyone"; (2) call Officer David Waliszewski as a witness because the officer prepared a report stating that he and his partner canvassed the neighborhood but none of the neighbors who were home during the incident saw or heard anything; (3) elicit testimony from Burns that the DNA showed two male sources; and (4) object to the State's mischaracterization of the DNA evidence in its closing argument.

¶10 The trial court denied the postconviction motion without a hearing, concluding that there was no prejudice from any of the alleged errors. The trial court noted there was no detail in Waliszewski's report about where the neighbors actually were during the incident, and, in any event, Guzman had admitted talking to the victim, so the lack of witnesses was "not particularly relevant as to his presence." The trial court was also unpersuaded that Nunez-Otero's testimony would have changed the verdict, because Guzman had also admitted telling I.M. she was pretty, asking whether she had a boyfriend, and giving his phone number to her. With respect to the DNA evidence, the trial court noted that DNA had not been used to identify the perpetrator; it simply tended to support I.M.'s allegations

4

that some man had sexual contact with her as described. Finally, the trial court concluded that the State's argument about the DNA evidence was fair game. Guzman appeals.

## DISCUSSION

¶11 "A hearing on a postconviction motion is required only when the movant states sufficient material facts that, if true, would entitle the defendant to relief." *State v. Allen*, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. Whether the motion alleges such facts is a question of law. *See id.*, ¶9. If the motion raises sufficient material facts, the trial court must hold a hearing. *See id.* If the motion does not raise sufficient material facts, if the motion presents only conclusory allegations, or if the record conclusively shows the defendant is not entitled to relief, then the decision to grant or deny a hearing is left to the trial court's discretion. *See id.*

¶12 The trial court has the discretion to deny "even a properly pled motion … without holding an evidentiary hearing if the record conclusively demonstrates that the defendant is not entitled to relief." *See State v. Sulla*, 2016 WI 46, ¶30, 369 Wis. 2d 225, 880 N.W.2d 659. A trial court's discretionary decisions are reviewed for an erroneous exercise of that discretion, a deferential standard. *See id.*, ¶23.

¶13 The requirements for showing ineffective assistance of counsel are well established. A defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. "Whether counsel was ineffective is a mixed question of fact and law." *Id.*, ¶19. The defendant must show both elements of the test, and we need not address both prongs if the

defendant fails to make a sufficient showing on one of them. *See **State v. Maloney***, 2005 WI 74, ¶14, 281 Wis. 2d 595, 698 N.W.2d 583.

## I. The Failure to Call Nunez-Otero as a Witness

¶14 "Failure to call a potential witness may constitute deficient performance." ***State v. Jenkins***, 2014 WI 59, ¶41, 355 Wis. 2d 180, 848 N.W.2d 786. Counsel's performance is deficient if it "fell below the objective standard of reasonably effective assistance." *See **id.***, ¶40. If deficient performance is established, the defendant must also show prejudice—that is, "the defendant must show that, absent defense trial counsel's errors, there was a reasonable probability of a different result." *See **id.***, ¶49.

¶15 Guzman contends that "Nunez-Otero's testimony was important because it contradicted testimony that Mr. Guzman apologized for hurting I.M." While it is true that Nunez-Otero told police that Guzman said he did not touch anyone, we are unpersuaded that the failure to call him was prejudicial. First, when Guzman allegedly made his denial, he was attempting to flee the scene. Attempted flight demonstrates consciousness of guilt. *See **State v. Miller***, 231 Wis. 2d 447, 460, 605 N.W.2d 567 (Ct. App. 1999). Second, Nunez-Otero testifying about Guzman's attempted flight would have corroborated testimony from I.M., M.M., and I.M.'s mother that Guzman tried to flee. Third, both M.M. and I.M.'s mother testified that Nunez-Otero was also present during Guzman's apology. Though the police report does not reflect that Nunez-Otero reported hearing an apology, it is reasonable to infer that he may have been able to

corroborate the others' testimony about the apology.[1]  Thus, we are unconvinced that calling Nunez-Otero to testify would have resulted in a different verdict, so Guzman has not sufficiently demonstrated prejudice from trial counsel's failure to call this witness, even if this failure might be seen as deficient performance.

*II.  Failure to Call Officer Waliszewski as a Witness*

¶16    Guzman next complains that trial counsel should have called Waliszewski "to attack the credibility of I.M.'s account of her interaction with Mr. Guzman."  Guzman says that the officer's report shows "three neighbors reported being home the whole time that this incident occurred, but they did not see anything."  Guzman contends this is significant because the event occurred while it was still light outside and I.M. had neighbors downstairs.  Thus, the jury never had "any opportunity to question I.M.'s version of events because it never learned that there were people around during the incident that never saw or heard a thing."

¶17    First, I.M. testified that two people were walking nearby while she was talking to Guzman, just before he assaulted her, so the jury did in fact hear that there were others nearby.  Second, according to Waliszewski's report, at least five neighbors were at home and none saw or heard anything involving Guzman.  However, though the report provides the neighbors' addresses, there is no indication of their actual proximity to I.M.'s home or porch, and the report does

---

[1] Guzman additionally suggested that calling Nunez-Otero would have undermined M.M.'s testimony because M.M. said he detained Guzman while the police report reflects that Nunez-Otero said he forced Guzman to the ground and stayed on top of him until the police arrived.  However, M.M. clarified on cross-examination that "the other gentleman" had grabbed and held Guzman while M.M. assisted.

not indicate where most of the neighbors were in their homes, so there is no reason to believe that any of them was even in a position to observe something at I.M.'s home—indeed, one of the interviewees stated he was watching television. Moreover, as the trial court noted, Guzman did not deny being at I.M.'s home, speaking with her, or giving her his phone number. Accordingly, the failure to call Waliszewski to testify that multiple neighbors saw nothing does not even remotely undermine our confidence in the outcome of the trial, so trial counsel was not ineffective in this regard.

### III. Failure to Elicit Additional Testimony from the Analyst

¶18     As noted, Burns's report indicated a "partial Y-STR DNA profile that is a mixture of DNA from at least two male individuals" on I.M.'s waistband and left hand. Guzman argues that "[e]liciting testimony from the analyst about this particular profile showing *at least two male individuals* was vital to illustrating to the jury [that it] should not give the DNA evidence much weight because DNA can be transferred in a variety of ways and can remain on objects."

¶19     However, trial counsel did elicit testimony from Burns about the mechanics of DNA transfer, including how difficult it is to transfer DNA by touch and how bodily fluids are a better transfer vehicle than touching. Guzman does not explain how having Burns testify about her determination of two male contributors is "vital" to diminishing the weight of the DNA evidence in light of Burns's more specific testimony about how DNA transfer works. We are therefore unpersuaded that trial counsel's performance in this regard was deficient or prejudicial.

### IV. Failure to Object to the State's Closing Argument

¶20     Related to Burns's conclusion of two male contributors, Guzman also argues that trial counsel:

> failed to object to the [S]tate's closing argument, which was that that Mr. Guzman was the only source of DNA and that he is the only place that could have come from. It argued that the DNA evidence "corroborate[d]" the victim's statement because "what other men could she have gotten this DNA on her palm from." The [S]tate argued that because I.M. lives with just her mom and her sister, there is no way other way male DNA could have possibly gotten on her palm. It reasoned that the DNA would not have come from her grandfather or any officer, so, it must have been from Mr. Guzman, which corroborates I.M.'s story.

Guzman complains that the State "mischaracterized the DNA evidence to the extent that it was misleading" because the State "was aware that the evidence shows that there was at least two males present in the DNA sample … [but] argued that there was only one male and that it could only have come from Mr. Guzman." Guzman contends this was an improper argument.

¶21     "Generally, counsel is allowed latitude in closing argument and it is within the trial court's discretion to determine the propriety of counsel's statements and arguments to the jury."[2] **State v. Cockrell**, 2007 WI App 217, ¶41, 306 Wis. 2d 52, 741 N.W.2d 267. "A prosecutor may comment on evidence and argue from it to a conclusion." **Id.** "Prosecutors may not ask jurors to draw

---

[2] A failure to timely object to closing argument waives the right to appellate review of the issue. *See* **State v. Guzman**, 2001 WI App 54, ¶25, 241 Wis. 2d 310, 624 N.W.2d 717. However, the error may still be indirectly reviewable as part of an ineffective assistance claim. *See, e.g.*, **State v. Duckett**, 2010 WI App 44, ¶6, 324 Wis. 2d 244, 781 N.W.2d 522 (unpreserved objection to sentencing argument reviewed in context of ineffective assistance claim).

inferences that they know or should know are not true." ***State v. Weiss***, 2008 WI App 72, ¶15, 312 Wis. 2d 382, 752 N.W.2d 372.

¶22    The relevant part of the State's closing argument was as follows:

> Also … we heard from the DNA analyst from the state crime lab. I will admit this is no smoking gun in the case, there is no DNA profile that says Jose Guzman touched this girl because his DNA is all over her palms. We don't have a DNA profile, we don't have a partial DNA profile; all the analyst could say is there is male biological material on one place on [I.M.], her left palm, that is all we've got. So it is no smoking gun, but it is also not nothing at all, it is significant evidence. Because what other men could she have possibly gotten this DNA on her palm from?

¶23    While this may be a hard blow, we are not persuaded it was a foul one. *See **id.***, ¶10; ***Berger v. United States***, 295 U.S. 78, 88 (1935). Here, there is nothing objectively false in the State's argument. It did not represent that there was only a single male contributor to the DNA recovered. Burns testified that DNA can be transferred by touch, so male DNA on I.M.'s hand is not inconsistent with the allegation that Guzman grabbed her hands and placed them on his penis, even though the exact source of the DNA was not identified. There is no suggestion that any other male had touched I.M. in any fashion, so it is not an unfair inference that Guzman was the source of some of the recovered DNA, even if there is also a second unknown source. The State does not suggest that the DNA conclusively established Guzman as I.M.'s assailant—in fact, it acknowledged the limits of the DNA in that regard. Rather, the State simply argued that the DNA evidence tended to support I.M.'s version of events because there is no alternate version that accounts for the presence of male DNA on her palm. We are unpersuaded that counsel was ineffective for failing to object to this closing argument.

**CONCLUSION**

¶24    Based on the foregoing, we conclude that Guzman did not plead sufficient material facts regarding deficient performance or prejudice to entitle him to a hearing and that the record establishes he is not entitled to relief. Thus, whether to grant a hearing on the postconviction motion was a discretionary decision for the trial court, and we are not persuaded that its discretion was erroneously exercised.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).